NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES,
PLAINTIFF-APPELLANT, v. A.W. AND R.W., JR.,
DEFENDANTS-RESPONDENTS.

IN THE MATTER OF E.W., K.W., R.W., III, M.W.,
AND J.W., MINORS.

Argued April 29, 1986—Decided July 30, 1986.

592

*Lauren Fleischer Carlton,* Deputy Attorney General, argued the cause for appellant New Jersey Division of Youth and Family Services (*W. Cary Edwards, Jr.,* Attorney General of New Jersey, attorney; *Andrea Silkowitz,* Deputy Attorney General, of counsel).

*Catherine M. Brooks,* Assistant Deputy Public Defender, argued the cause for respondents E.W., K.W., R.W., III, M.W., and J.W. (*Thomas S. Smith, Jr.,* Acting Public Defender, attorney).

*Sam Denstman,* argued the cause for respondent R.W., Jr.

*Barry D. Berman,* Designated Counsel, argued the cause for respondent A.W. (*Thomas S. Smith, Jr.,* Acting Public Defender, attorney).

The opinion of the Court was delivered by

O'HERN, J.

This appeal concerns the standard for termination of parental rights under *N.J.S.A.* 30:4C–15 and –20. We hold that the trial court incorrectly emphasized the economic and social disadvantages of respondent-parents as factors that excused or outweighed in significance the essentially uncontradicted showing of serious harm suffered by the children as a result of a lack of nurturing care in the home. We direct that the matter be promptly reconsidered in light of the applicable legal standards with the goal of permanently settling the situation of these five children as soon as possible.

I

At issue is the well-being of seven members of a troubled family in one of our urban centers. The parents, Robert and Adrian, are now 35 and 30 years of age, respectively. Both have limited backgrounds and abilities. Robert, the father, has been diagnosed as having a borderline personality disorder and Adrian has been diagnosed as having pronounced limitations

that affect her judgment and capacity to care for her children. Robert struggles to be economically independent by working in a local restaurant.

Because these proceedings presuppose "care or custody" of the children with the Division of Youth and Family Services (DYFS), *N.J.S.A.* 30:4C–15(c) and (d), a review of the agency's history with this family must be undertaken. The investigatory records of DYFS reveal the following.[1] The couple had their first child, Ennett, in 1974. In June of 1975, DYFS received a complaint from Robert's mother, alleging that Adrian had abandoned Ennett. DYFS workers found Adrian in a hospital. She was severely injured. She attributed her injuries to an assault by Robert. Upon release from the hospital, DYFS assisted Adrian in moving herself and Ennett to her mother's home. Eventually both Adrian and Ennett moved back in with Robert.

In June 1976, a welfare board worker referred Adrian and Ennett to DYFS. Mother and daughter were removed from the home; Adrian, however, returned the next day. In July of 1976, Adrian signed a placement agreement whereby Ennett would be cared for by her paternal great grandmother. DYFS continued to supervise Ennett but lost touch with the parents.

The Division regained contact with the couple in 1977. Though Robert allegedly continued to beat her, Adrian married him in October 1977. In March 1978, they resumed care of Ennett under the supervision of DYFS.

---

[1] Whenever the Division of Youth and Family Services (DYFS) petitions for termination of parental rights, a summary of the Division's records of the case shall be filed with the petition. *N.J.S.A.* 30:4C–16. In the proceeding before the trial court, the Division may submit into evidence "reports by [Division] staff personnel * * * prepared from their own first-hand knowledge of the case, at a time reasonably contemporaneous with the facts they relate, and in the usual course of their duties with the [Division]." *In re Guardianship of Cope,* 106 *N.J.Super.* 336, 343 (App.Div.1969). "Reports of this type, prepared by the qualified personnel of a state agency charged with the responsibility for overseeing the welfare of children in the State, supply a reasonably high degree of reliability as to the accuracy of the facts contained therein." *Id.* at 344.

In September 1978, a daughter, Kimberly, was born. In November of 1978, Adrian asked DYFS to remove herself and the two girls from the home due to her own fears for the safety and well-being of the children. She claimed that her husband not only beat her but also had threatened to kill her with a knife. After a week in a shelter, she returned home with the children. The DYFS worker who tried to do a follow-up visit was told by Robert that he would kill the worker if he returned again.

In December 1978, the two girls were placed in foster care with the agreement of their parents. Ennett, then four years old, showed signs of physical injury as well as severe emotional disorder. At that time, the DYFS worker had been repeatedly informed by Adrian that her husband assaulted her and that she feared for her own safety. The worker had seen Robert in a variety of moods ranging from despair to rage. Intense hostility was the dominant tone of what the worker viewed as a violent, unpredictable personality. Adrian was seen as an extremely passive, unassuming person who did not appear to be able to function outside of the confines of her present marital situation. She described to the worker the frequency and increased intensity of beatings by her husband, from whom she was unable to sever her ties.

DYFS contends that it tried thereafter to help the parents resume the care of their children but the efforts were unsuccessful. They remained in foster care. Two boys, Robert and Michael, were born in 1979 and 1980. Soon after Michael's birth, a DYFS worker visited the home and was told by Robert that DYFS could keep the girls but he would "kill anyone who tries to take the boys."

On October 8, 1980, on the motion of the Division, an order was entered placing Ennett and Kimberly under the care, custody, and supervision of DYFS; young Robert was placed under DYFS's supervision. In that and subsequent proceedings, law guardians were appointed to represent the children,

and counsel were appointed for the parents. In this proceeding, Robert was represented by *pro bono* counsel.

The girls continued to be separated from and were not seen by their parents for over a year. The parents continued to reject all of DYFS's attempts to provide homemaker services, counseling, and visits with the girls. DYFS workers who visited the home in 1981 found it in "total disarray." In early 1982, Adrian gave birth to a fifth child, a boy, Jacob. Jacob died in September 1982. Faced with information that the infant's death was not accidental, a DYFS caseworker went to the home and found what she considered to be appalling conditions of neglect. The two young boys who were with their parents showed minor signs of physical neglect but major signs of a lack of emotional and developmental growth. On October 7, 1982, on DYFS's motion, an order was entered placing Robert and Michael under the care, custody, and supervision of the Division. The two boys were placed in foster care.

Despite the problems, DYFS sought to work with the parents to facilitate returning the boys and eventually reuniting the entire family. Jacob's death was confirmed as not being the result of foul play; it was attributed to sudden-infant-death syndrome. DYFS arranged for supervised visitation with the children at a child-care center and sought to build, at least in Adrian, a greater strength and ability to provide care for the children. Until 1984, the Division continued to help the parents but all efforts appeared unsuccessful. Of both parents, one witness later concluded:

> [T]heir comprehension is on the level of a child basically. Their judgment, insight, understanding, ability to predict from one step to the next, ability to perceive what is happening and understand what is going on are very, very limited compared to other adults of their age.

Finally, in July 1984, their last child, Joseph, was born. Because of concern for his health, Joseph was immediately placed under DYFS's care.[2]

Following a two-day trial in October 1984, the Family Part reserved decision on the question whether parental rights should be terminated. The trial judge issued a decision from the bench on January 25, 1985. Regrettably, Ennett and Kimberly's foster mother died before the court reached its decision. The court deferred decision on the two girls pending evaluation of their relationship with their new foster mother, though the court indicated its belief that they too should ultimately be returned to the natural parents. As for the boys, however, the court found it was in their best interests that they be returned to their natural parents. In its view the events were beyond the control of the parents: "[The] most that can be said combining the assessments of parents and children is that they are victims of cultural and financial deprivation." The court further emphasized that DYFS had made "no attempt * * * to * * * keep the family unit integral." The three boys were ordered returned to their parents with the direction that they be placed under the protective supervision of DYFS for one year. The trial court's decision was stayed pending appeal. The Appellate Division affirmed the judgment in an unreported opinion. We granted the State's petition for certification. 103 *N.J.* 471 (1986).

---

[2] A full history of the procedures follows: Joseph remained in the hospital under a protective-services hold pending his parents' completion of a training course in use of a monitor and administration of cardiopulmonary resuscitation. Adrian and Robert completed the training on August 1, 1984. On August 5, DYFS requested an order granting custody of Joseph and continuing custody of Robert and Michael. An Order to Show Cause was entered on August 6, setting a hearing for August 9. On August 10, the Family Part entered an interlocutory order returning the three boys to the custody of their parents under the supervision of DYFS. On August 14, the Appellate Division entered an order staying the interlocutory order and retaining the boys in the custody of DYFS pending a fact-finding hearing. Thereafter, the original trial judge recused himself from the case, the matter was reassigned for trial, and, finally, on September 6, 1984, DYFS filed a new complaint seeking termination of parental rights in each of the five children. The various actions were consolidated for this disposition.

## II

Termination of parental rights presents the legal system with an almost insoluble dilemma. On the one hand, we emphasize the inviolability of the family unit, noting that "[t]he rights to conceive and to raise one's children have been deemed 'essential,' * * * 'basic civil rights of man,' * * * and '[r]ights far more precious * * * than property rights' * * *." *Stanley v. Illinois*, 405 *U.S.* 645, 651, 92 *S.Ct.* 1208, 1212, 31 *L.Ed.*2d 551, 558 (1972) (citations omitted). The interests of parents in this relationship have thus been deemed fundamental and are constitutionally protected. On the other hand, it has been recognized "that a state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized." *Parham v. J.R.*, 442 *U.S.* 584, 603, 99 *S.Ct.* 2493, 2504, 61 *L.Ed.*2d 101, 119 (1979) (citing *Wisconsin v. Yoder*, 406 *U.S.* 205, 230, 92 *S.Ct.* 1526, 1540, 32 *L.Ed.*2d 15, 33 (1972)).

These two concepts run so deeply in our culture that we find their reconciliation to be very difficult. Preservation of the traditional family is a staple of social rhetoric. It is that model of the family that our popular culture portrays. Yet, reality must intrude into this idealized view of American family life. The dark side to this is that "[a]s with so many other legal presumptions, experience and reality may rebut what the law accepts as a starting point; the incidence of child neglect and abuse cases attests to this." *Parham v. J.R., supra*, 442 *U.S.* at 602, 99 *S.Ct.* at 2504, 61 *L.Ed.*2d at 119. Thus, it has been held that the right of parents to be free from governmental intrusion is not absolute. "The State as parens patriae may act to protect minor children from serious physical or emotional harm. In some instances this may require a partial or complete severance of the parent-child relationship." *In re Dep't of Pub. Welfare*, 383 *Mass.* 573, 587, 421 *N.E.*2d 28, 36 (1981). Even though dissenting on the imposition of a federal standard of proof in a state termination proceeding, Justice Rehnquist recognized the stakes involved:

> Few consequences of judicial action are so grave as the severance of natural family ties. Even the convict committed to prison and thereby deprived of his physical liberty often retains the love and support of family members. [*Santosky v. Kramer*, 455 *U.S.* 745, 787, 102 *S.Ct.* 1388, 1412, 71 *L.Ed.*2d 599, 628 (1982).]

In fulfillment of its protective jurisdiction over children when their physical or mental health is jeopardized, New Jersey has enacted a comprehensive regulatory program. DYFS is generally responsible for providing, through a variety of programs, necessary facilities and resources for children whose needs cannot be or are not being met by their families. *See N.J.S.A.* 30:4C-1, -2(a), and -4.[3] DYFS is specifically authorized to place a child in a foster home "[w]henever the circumstances of [the] child are such that his needs cannot be acequately met in his own home * * *." *N.J.S.A.* 30:4C-26(a). Moreover, the Legislature has provided specific conditions under which the Division may seek to terminate the rights of natural parents, thereby freeing their minor children for adoption. *See N.J.S.A.* 30:4C-15, -20. In this case we focus upon subsection (c) of *N.J.S.A.* 30:4C-15, which provides that if "the best interests of any child under the care or custody of the [Division] require that he be placed under guardianship[,]" then the Division may petition the court for termination of parental rights.[4]

> If upon the completion of such hearing the court is satisfied that the best interests of such child require that he be placed under proper guardianship,

---

[3]The Division of Youth and Family Services has additional responsibilities in cases involving abuse, abandonment, cruelty, and neglect under *N.J.S.A.* 9:6-1 to -8.73.

[4]*N.J.S.A.* 30:4C-15 establishes four classes of children for whom permanent termination of parental rights may be sought:
 (a) A child whose parents, guardian or custodian have been convicted of abuse, abandonment, neglect or cruelty under
 *N.J.S.A.* 9:6-1 to -8.73;
 (b) A child who has been adjudged delinquent;
 (c) A child under the care and custody of the Division whose best interests require that he be placed under guardianship, or
 (d) A child placed in foster care whose parents have failed to maintain their parental responsibilities.

such court shall make an order terminating parental rights and committing such child to the guardianship and control of the [Division], and such child shall thereupon become the legal ward of [the Division], and [the Division] shall be the legal guardian of such child for all purposes, including the placement of such child for adoption. [*N.J.S.A.* 30:4C–20.]

"Termination of parental rights is essentially, of course, a statutory proceeding; but the statute does not say it all. Overlying constitutional considerations, constantly recurring statutory amendments, and the rapidly evolving nature of present-day social theory and public policy make judicial interpretation an inevitable and indispensable part of critical legal operation." *Champagne v. Welfare Div. of Nevada State Dep't of Human Resources*, 100 *Nev.* 640, 663, 691 *P.*2d 849, 865 (1984). Indeed, were the sole criterion stated to be in terms of the best interests of the child, it would be suspect for vagueness because of the important constitutional interests involved.

Social scientists, scholars, and family workers, however, are deeply divided on the proper standards for termination of parental rights. A recent symposium based on a 1983 Conference on Psychological Parenting and Child Welfare Decision-Making illustrates the divergent views. One commentator was gravely concerned that

[w]hen the rights of children and parents come into conflict, our society has traditionally protected the rights of parents if those parents are affluent or middle class. We respect the privacy and autonomy of middle-class families. In contrast, we have accepted intervention and intrusion in low-income families, and we have discounted the cultural backgrounds and solid parenting skills of low-income parents. To protect poor children, we have created a legal structure that disregards the rights of their parents and the cooperative values of many minority families.

[Stack, *Cultural Perspectives on Child Welfare*, 12 *N.Y.U.Rev.L. & Soc. Change* 539, 547 (1983–84).]

To some extent, we believe that the trial court was understandably concerned that the economic and social conditions of the parents should not be critical factors in determining their right to raise their children. But the price of focusing on the plight of the parents in these types of cases is that the child is kept in

waiting for what the decision-makers view as the ideal or best placement. As another commentator noted:

> Unwittingly, in this way they let time corrode and wear down the child's development as they try to do what they understand better, that is, to determine what is fair between warring adults. It is easier to sympathize with and identify with the adults who are in conflict. The child's interests are deferred until the dispute between the adults is resolved. In this way the passage of time damages the child's development to the child's greater, not lesser detriment. Then the child's best interests are considered not paramount but secondary to the adults' best interests.
>
> [Solnit, *Psychological Dimensions in Child Placement Conflicts,* 12 *N.Y.U. Rev.L. & Soc.Change* 495, 499 (1983–84).]

Most can agree that in those "extremely brutal situations where there is almost no humanity left in the relationship of the parent to the child * * * we should move expeditiously to save the child from such a situation." Fanshel, *Urging Restraint in Terminating the Rights of Parents of Children in Foster Care,* 12 *N.Y.U.Rev.L. & Soc.Change* 501, 502 (1983–84). Where the experts are in disagreement is in the great middle-range of cases involving beleaguered parents with uneven track records. These hard cases raise complicated questions concerning legal and civil rights.

██ As judges, it is our duty within constitutional bounds to effectuate the choice between these policies as reflected in our legislative scheme. New Jersey, unlike some states, has not adopted a detailed statutory formula.[5] Our statute speaks

---

[5]By contrast, many states have extremely explicit standards. *See, e.g., Colo.Rev.Stat.* § 19–11–105 (1978) (termination appropriate where child is "adjudicated dependent or neglected" and parent is unfit, parent does not comply with "appropriate treatment plan," and "conduct or condition of the parent or parents is unlikely to change within a reasonable time"); *N.C.Gen. Stat.* § 7A–289.32 (Supp.1985) (termination may be based on one or more of nine detailed grounds); *Tex.Fam.Code Ann.* § 15.02(1) (Vernon 1985) (listing approximately thirteen acts or omissions, one or more of which must be proven in an involuntary termination case); *Va.Code* § 16.1–283(B), (C), and (D) (1950) (listing three general grounds for termination of parental rights with each category enumerating precise standards and requirements for *prima facie* case).

of the "best interests" of the child.[6] We emphasize at the outset that the "best interests" of a child can never mean the better interests of the child. *In re Guardianship of Cope*, 106 *N.J.Super.* 336, 340–41 (App.Div.1969). It is not a choice between a home with all the amenities and a simple apartment, or an upbringing with the classics on the bookshelf as opposed to the mass media, or even between parents or providers of vastly unequal skills. As noted in *Doe v. G.D.*, 146 *N.J.Super.* 419 (App.Div.1976), *aff'd sub nom. Doe v. Downey*, 74 *N.J.* 196 (1977):

> Equally inappropriate was the trial court's conclusion that N. was neglected or abused because of G.'s failure to educate or provide her with intellectual stimulation. The reference to education [in the neglect statute] * * * concerns parental encouragement to truancy of a school age child, or other interference with normal educative processes. It does not, and cannot, have reference to the more subtle and intangible incidents of a home environment of a preschool infant which hopefully would encourage beneficial intellectual growth; to so hold would be to sanction state intrusion into the personal relationship between parent and child to an intolerable degree and would impermissibly impair the normal prerogatives of parenthood. The enactment was never meant to provide governmental monitoring of these intimate details of the parent-child relationship.
>
> [146 *N.J.Super.* at 431, *quoted in* 74 *N.J.* at 199.]

The standard must therefore reflect the constitutional significance of the interest being protected.

*In re Guardianship of Cope, supra*, stated it thus:

> It is, therefore, incumbent upon the [Division], or other petitioner for guardianship, to show more than that it will provide a better home for the child. It must demonstrate affirmatively that the child's "best interests" will be substantially prejudiced if he is permitted to remain with his parent—*e.g.*, that his health and development have been or probably will be impaired and that the parent is unlikely or unwilling to change, or that the parent is in some way incapable of caring for the child or unwilling to do so.
>
> [106 *N.J.Super.* at 340–41.]

---

[6]Although the consolidated cases encompass allegations of neglect and abuse under Chapter 6 of Title 9, *N.J.S.A.* 9:6–1 to –8.73, the case before us proceeded primarily on the basis of the best-interests-of-the-child standard contained in *N.J.S.A.* 30:4C–15(c) and –20.

This standard is similar in content to that of other states.[7] To the basic focus upon the injury to the child we would add what we believe is implicit—that in a termination proceeding a trial court would determine that:

(1) *The child's health and development have been or will be seriously impaired by the parental relationship.*

■ The primary focus of the court should be upon harm for which there is "unambiguous and universal social condemnation." *Developments in the Law—The Constitution and the Family*, 93 *Harv.L.Rev.* 1156, 1319 (1980). Paramount examples of such condemnation are evident in the context of physical and sexual abuse. For example, *N.J.S.A.* 30:4C–15(a) authorizes termination of parental rights when a judgment of conviction has been entered based on abuse, abandonment, neglect of, or cruelty to the child. In Title 9, the definition of "abused or neglected child" includes "a child * * * whose parent * * * inflicts or allows to be inflicted upon such child * * * protracted impairment of * * * emotional health * * * or a child whose * * * mental, or emotional condition has been impaired or is in

---

[7]For example, in Massachusetts "natural parents may not be deprived of the custody of their minor children in the absence of a showing that they 'have grievous shortcomings or handicaps that would put the child's welfare in the family milieu much at hazard,' or 'unless some factor such as lengthy separation and a corresponding growth in the ties between the child and the prospective adoptive parents indicate[s] that the child would be hurt by being returned to the natural parents.'" *In re Dep't of Pub. Welfare*, 383 *Mass.* 573, 590, 421 *N.E.*2d 28, 38 (1981) (quoting *In re New England Home for Little Wanderers*, 367 *Mass.* 631, 639, 642, 646, 328 *N.E.*2d 854, 859, 861, 863 (1975)).

Before adoption by the state legislature, Colorado's judicially developed standard

require[d] that the following conditions be satisfied before parental rights are terminated: (1) evidence of severe and continuous neglect by the parent whose rights are sought to be terminated; (2) a finding of a substantial probability of future deprivation to the child; (3) a determination that under no reasonable circumstances can the welfare of the child be served by a continuation of the parental relationship; and (4) a consideration of less drastic alternatives and a specific elimination of these alternatives prior to termination.

[*People in the Interest of E.A.*, 638 *P.*2d 278, 284 (Colo.1981) (en banc).]

imminent danger of becoming impaired as the result of the failure of his parent * * * to exercise a minimum degree of care * * *." *N.J.S.A.* 9:6–8.21. Serious emotional injury and developmental retardation should thus be regarded as constituting an injury to the child.

██ Not every injury—real or imagined—to the child's psyche satisfies the test. Still, in some cases, the potential for emotional injury can be the crucial factor in child placement. *See, e.g., Sees v. Baber,* 74 *N.J.* 201, 222 (1977) ("psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood"). The potential return of a child to a parent may be so injurious that it would bar such an alternative. In this case, for example, visits with his parents have allegedly disturbed Michael. The trial court therefore must consider the potential for serious psychological damage to the child. *Sorentino v. Family and Children's Soc'y,* 72 *N.J.* 127, 131–32 (1976) (*Sorentino I*). "[T]he mental health of the child and its best interest psychologically must always be considered." *In re Guardianship of R.,* 155 *N.J.Super.* 186, 194 (App.Div.1977). "The absence of physical abuse or neglect is not conclusive * * *." *Id.*

(2) *The parents are unable or unwilling to eliminate the harm and delaying permanent placement will add to the harm.*

We must emphasize that what is at stake here is not that a parent lacks the financial wherewithal to elevate the child's intellectual stimulation. The Supreme Court of California has put it thus: "It is true that [the natural mother] was poor, but the hallmark of an effective parent has never been the parent's bank account. Children can be and are loved and nurtured in poverty-stricken families and deprived and neglected in affluent homes. In our view, this record simply demonstrates an extreme case of deficient parenting." *In re Laura F.,* 33 *Cal.*3d 826, 837, 662 *P.*2d 922, 929, 191 *Cal.Rptr.* 464, 471 (1983) (en

banc). In referring to the parents' role, we are not concerned here with what may be called "inadequate parenting." [8] Hence,

---

[8] A regrettably long footnote conveys a fuller understanding of what is meant by "inadequate parenting" in this context:

*Inadequate parenting*

While no empirical studies provide a statistical breakdown of the reasons for intervention in neglect cases, probably the largest category of cases involves persons thought to be "inadequate parents." All commentators agree that the great majority of neglect cases involve very poor families who are usually receiving welfare. Most of the parents are not merely poor, however. In addition to the problems directly caused by the poverty—poor housing, inadequate medical care, poor nutritional practices—many of these parents can be described as extremely "marginal" people, that is they are continually at the borderline of being able to sustain themselves—economically, emotionally, and mentally.

Their plight is reflected in their home situations. Their homes are often dirty and· rundown. Feeding arrangements are haphazard. One or both parents may * * * be retarded, which may affect the quality of their child care. * * * *

Such parents may provide little emotional support for their children. While the children may not be physically abused, left unattended, dangerously malnourished, or overtly rejected, they may receive little love, attention, stimulation, or emotional involvement.

* * * * * * * *

It is certainly very tempting to intervene to help such children. Intervention might be justified both to protect the children by providing them with an environment in which they can better reach their potential and to protect the state, since it is claimed that such children will probably end up as delinquents, criminals, or welfare recipients. Without intervention, we may be perpetuating a "culture of poverty."

Despite the appeal of these arguments, parental "inadequacy" in and of itself should not be a basis for intervention, other than the offer of services available on a *truly* voluntary basis. The term "inadequate home" or "inadequate parent" is even harder to define than emotional neglect. There is certainly no consensus about what types of "inadequate" behavior would justify intervention. Given the vagueness of the standard, almost unlimited intervention would be possible.

* * * * In fact, by focusing solely on parental behavior, child-care workers often ignore the many strengths a given child may be deriving from his environment. As I have stressed, the complexity of the process by which a child relates to any environment defies any attempt to draft laws solely in terms of environmental influences.

Moreover, there is every reason to be extremely pessimistic about the utility of coercive intervention. The services necessary to help these families are generally unavailable. More day-care centers, homemakers, health facilities, and job training programs would all be needed if interven-

a court should focus upon whether, within this setting, the parents are giving the child the nurture and affection that money cannot provide.

A court analyzing the ability of the parents to give their children care should not look at the parents to determine whether they are themselves unfit or whether they are the victims of social circumstances beyond their control; it should only determine whether it is reasonably foreseeable that the parents can cease to inflict harm upon the children entrusted to their care. No more and no less is required of them than that they will not place their children in substantial jeopardy to physical or mental health. There is a natural tendency to want to continue working with the parents to restore the family unit. How long a court should be willing to wait, however, depends in part on the age of the child. *In re Welfare of Hall*, 99 *Wash.*2d 842, 850, 664 *P.*2d 1245, 1250 (1983) (en banc).

---

tion were to mean anything more than periodic visits by a social worker. Such visits themselves are costly, have not been shown to be effective, and may be resented by the parent who will blame the child for the outside meddling.

Even when "inadequate" parents seek help, agencies often lack the resources or ability to alleviate undesirable home conditions. The chances of success are even lower when the family resists intervention. Few communities have sufficient personnel and programs to permit meaningful intervention, even in cases involving physical abuse or severe emotional damage. It is highly questionable whether limited resources ought to be expended on families with less severe problems, unless the families request services or accept them voluntarily.

Furthermore, when parents do not respond to the "treater," the next step is to remove the children. Yet there is no evidence demonstrating that children from such families are helped through placement.

In an ideal world, children would not be brought up in "inadequate" homes. However, our less than ideal society lacks the ability to provide better alternatives for these children. The best we can do is to expand the social welfare services now offered families on a voluntary basis.

[Wald, *State Intervention on Behalf of "Neglected" Children: A Search for Realistic Standards*, 27 *Stan.L.Rev.* 985, 1021–24 (1975), *quoted in Champagne v. Welfare Div. of Nevada State Dep't of Human Resources*, 100 *Nev.* 640, ——, 691 *P.*2d 849, 858 n. 7 (1984).]

*(3) The court has considered alternatives to termination.*

Although this provision is not explicit in the *Cope* standard, we believe that it is implicit in the overall scale of review of what is in the best interests of the child. The Child Placement Review Act, *N.J.S.A.* 30:4C–50 to –65, requires a "placement plan for each child placed outside his home * * * [to] include * * * [a] statement of the goal for the permanent placement or return home of the child * * *." *N.J.S.A.* 30:4C–55. A court should require as part of the case in chief consideration of the plan that was developed for the child.[9] As noted, there is a great tension here because, to the extent that adults—and when we speak of adults we mean courts, social workers, and therapists—delay the permanent decision, they lose sight of the child's concept of time. *See* J. Goldstein, A. Freud, and A. Solnit, *Beyond the Best Interests of the Child* 43 (1973) ("Three months may not be a long time for an adult decisionmaker. For a young child it may be forever"). Still, reaching a decision may take time because New Jersey courts have always respected the primary significance of the family as an intact social unit. *See In re Adoption of Children by D.*, 61 *N.J.* 89, 93 (1972) (" 'child's relationship with the parent is of such significance that all doubts are to be resolved against its destruction' ") (quoting *In re Adoption of Children by N.*, 96 *N.J.Super.* 415, 425 (App.Div.1967)).

"Legislative and judicial policy have dictated that the child's 'best interests' be protected 'so far as practicable' by providing welfare services to support and maintain the integrity of the biological family as a living unit." *New Jersey Div. of Youth and Family Servs. v. B.W.*, 157 *N.J.Super.* 301, 308 (Camden County Ct.1977) (citing *N.J.S.A.* 30:4C–1 to –65, *In re Guardi-*

---

[9] A sample complaint contained in the 1984 "Guidelines for the Guardianship Process," approved by this Court and DYFS, provides information concerning any plans developed for the child or children at issue, including alternatives to termination such as foster care, placement with relatives, and counseling for the natural parents.

*anship of Cope, supra,* 106 *N.J.Super.* 336, and *In re Guardianship of B.C.H.,* 108 *N.J.Super.* 531 (App.Div.1970)). This public policy is also expressed in the cooperative federal-state program, Aid to Families with Dependent Children, that requires "a plan for assuring that the child receives proper care and that services are provided to the parents, child, and foster parents in order to improve the conditions in the parents' home [and] facilitate return of the child to his own home or the permanent placement of the child * * *." 42 *U.S.C.A.* § 675(1). In other states, such a requirement has been found in the laws either explicitly or implicitly. *See, e.g., People in the Interest of L.L.,* 715 *P.*2d 334, 337–38 (Colo.1986) (en banc) (failure to comply with appropriate treatment plan must be found before termination); *see also In re P.F.J.,* 174 *Ga.App.* 47, 48, 329 *S.E.* 2d 194, 195 (1985) ("a thorough investigation of all such possible alternatives is expected before recourse to complete termination of parental rights is sought"); *In re Brungardt,* 211 *Neb.* 519, 527, 319 *N.W.*2d 109, 114 (1982) (court may "order a parent to make reasonable efforts to rehabilitate"; " 'failure of those efforts is another independent reason justifying termination of parental rights' ") (quoting *In re Wood,* 209 *Neb.* 18, 23–24, 306 *N.W.*2d 151, 154 (1981)). A common alternative is placement with a relative or relatives.[10]

> When a child is placed with a relative, termination is both unnecessary and unwise unless the relative wishes to adopt the child or is unwilling to provide long-term care. As long as the relative is willing to provide care until the parents can resume custody, the child's needs for stability and attachment are satisfied. In fact, initiating termination might place the relative in the awkward position of having to act against the parents.

> [Wald, *State Intervention on Behalf of "Neglected" Children: Standards for Removal of Children from Their Homes, Monitoring the Status of Children in Foster Care, and Termination of Parental Rights,* 28 *Stan.L. Rev.* 623, 697 (1976) (footnote omitted).]

---

[10]In some cases, however, uncertainty about the potential return of parents may be so injurious that it will bar such an alternative. In this case, as noted before, Michael allegedly is disturbed by increased contact with his parents.

Some factors that suggest that efforts to reunite the family "are no longer reasonable" include "parents [who] refuse to engage in therapy or other services; * * * parents [who] cannot benefit from therapy or instruction due to mental retardation or psychosis; * * * parents [who] threaten workers, child, foster parents, or therapists; * * * another child in the home is abused or neglected and taken into care; * * * [and the] child shows serious adverse reaction to contact with parent * * *." Ducote, *Why States Don't Terminate Parental Rights, Justice for Children* 3 (Winter 1986). We expect that in most cases the court will be presented with a record that will have adequately canvassed the alternatives to termination of parental rights.

(4) *The termination of parental rights will not do more harm than good.*

While this may appear to be nothing more than a tautological statement, what the concept conveys is that termination of parental rights will result, among other things, in a permanent resolution of the child's status. Some have suggested that "[a] decision to terminate parental rights should not simply extinguish an unsuccessful parent-child relationship without making provision for * * * a more promising relationship * * * [in] the child's future * * *." Ketcham and Babcock, *Statutory Standards for the Involuntary Termination of Parental Rights,* 29 *Rutgers L.Rev.* 530, 542–43 (1976).

If one thing is clear, it is that the child deeply needs association with a nurturing adult. Since it seems generally agreed that permanence in itself is an important part of that nurture, a court must carefully weigh that aspect of the child's life. *See, e.g., Alsager v. District Court,* 406 *F.Supp.* 10, 23–24 (S.D. Iowa 1975), *aff'd,* 545 *F.*2d 1137 (8th Cir.1976) ("improvident physical separations and final terminations can visit [harmful effects] upon young children"; thus, "terminations must only occur where more harm is likely to befall the child by staying with his parents than by being permanently separated from them"). Hence, courts should consider the permanency plan presented:

It is an unfortunate truth that not all children, who are "freed" from their legal relationship with their parents, find the stable and permanent situation that is desired even though this is the implicit promise made by the state when it seeks to terminate the parent-child relationship. Multiple placements and impermanent situations sometimes mark the state's guardianship of a child. This unstable situation is frequently detrimental to a child. Indeed, the detriment may be greater than keeping the parent-child relationship intact since the child's psychological and emotional bond to the parent may have been broken with nothing substituted in its place.

[*In re Angelia P.*, 28 *Cal*.3d 908, 930, 623 *P*.2d 198, 210, 171 *Cal.Rptr.* 637, 649 (1981) (Bird, C.J., concurring and dissenting) (footnotes omitted).]

Naturally, there will be circumstances when the termination of parental rights must precede the permanency plan. A multiply-handicapped child or a young adolescent might not be adoptable at the time of the termination proceedings. In other cases, the court will have to consider whether the child has already developed "a filial relationship [with another] * * * that * * * cannot be destroyed or changed without some risk of emotional harm to the child." *Sees v. Baber, supra,* 74 *N.J.* at 222. Just such a relationship was recognized in *Sorentino II*[11] as warranting, with proper notice, a termination of parental rights. As we have seen in this case, the filial relationship that the girls had developed with their foster mother was ended by her untimely death. In other cases, the court may consider whether placement with an extended-family member can give the child both continuing nurture and roots.

### III

These then are the standards that should be followed in a termination case. As to the burden of proof, in *Santosky v. Kramer, supra,* 455 *U.S.* 745, 102 *S.Ct.* 1388, 71 *L.Ed.*2d 599, the United States Supreme Court held that the Fourteenth Amendment requires application of at least a "clear and convincing" standard of proof to a state's parental-rights-termination proceeding. *Id.* at 747–48, 768–70, 102 *S.Ct.* at 1402–04, 71 *L.Ed.*2d at 603, 616–17. In reaching this conclusion, the

---

[11]*Sorentino v. Family and Children's Soc'y,* 74 *N.J.* 313 (1977).

Court noted its "historical recognition that freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment." *Id.* at 753, 102 *S.Ct.* at 1394, 71 *L.Ed.*2d at 606. That fundamental liberty interest

> does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. * * * If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures.
>
> [*Id.* at 753–54, 102 *S.Ct.* at 1395, 71 *L.Ed.*2d at 606 (footnote omitted).]

The correct standard is "clear and convincing" proof. It is the standard that our courts have followed. *See In re Guardianship of R., supra,* 155 *N.J.Super.* at 193 ("Division has the burden of establishing [the] grounds for termination of parental rights by clear and convincing evidence") (citing *In re Guardianship of B.C.H., supra,* 108 *N.J.Super.* at 537, and *In re Adoption of Children by N., supra,* 96 *N.J.Super.* at 424). With this in mind, we turn to an application of the appropriate standards to the specific record before us in this case.

## IV

The primary focus of the trial testimony was upon the injuries that the children of this family had suffered. Although there is a regrettable cultural cast to the words chosen by the experts to convey the significance of their findings, it is clear to us that they did not intend to express a cultural bias against the economic, racial, or ethnic conditions in which they found these children.

What the witnesses sought to convey when they spoke of "cultural deprivation", lack of exposure to "language stimulation", and the failure to offer a "culturally rich and stimulated home environment" was not that the children did not speak in polysyllables but rather that they had little or no vocabulary at all; not that they were incapable of advanced reasoning but that they failed to grasp the most basic of concepts—that an

object rolled under a table would remain there though not visible; not that they could not discern a work of art but that they could not relate to familiar objects such as blocks and squares.

We can share the concerns of the trial court that there not be any cultural bias. Still, we cannot avert our eyes from the grave injury that these children have suffered. We are sympathetic to the plight of these parents, who may suffer because of the larger faults of society. Nevertheless, we do not believe that their economic or social circumstances were proven to be the cause of their children's condition. The regrettable injury to the growth and development of the children was due not to economic deprivation or lack of resources but to a fundamental lack of the most precious of all resources, the attention and concern of a caring family.

As to Ennett and Kimberly, the proofs were most demonstrative. There was proof that Ennett suffered from a severe disability bordering on psychosis that was attributed to her early exposure to violence in the home. She was described as "starving for attention." Returning her to a home not purged of all violence would be, in the view of the witnesses, fatal. At the time of trial, the only home that Kimberly had ever known was her foster mother's. There was a "very intense emotional bond between these two girls" (Kimberly and Ennett). The clinical psychologist who testified at trial concluded that the two girls clearly needed to remain together. In Kimberly's case, then, were she returned to her parents at the time of trial, she would have suffered the emotional loss of both her foster mother, whom she called "grandma," and her sister. Her relationship with her sister remains critical.

As to the boys, Robert was "significantly developmentally delayed." He was already a year behind in his ability to form the simplest perceptions of the world about him; he would be "not capable of independent living unless changes were made."

In Michael's case, a "continued lack of exposure [to nurturing care] would eventually doom him."

As tragic as the consequences to the parents of the loss of their children may be, we cannot ignore evidence of serious injury. It is inappropriate to disregard a clear and essentially undisputed showing of such injury and its probable consequences because society may have been unfair to the parents.

■ Nor do we believe it appropriate to consider as a factor mitigating or excusing the showing of injury to the children that, in the case of Robert and Michael, their placement had not been successful, or that following the death of Ennett and Kimberly's foster mother there had been difficulties with the new foster parent. These are the inevitable consequence of temporary living arrangements. *See* New Jersey State Child Placement Advisory Council, *Barriers to Permanency Planning* (1983) (reciting the administrative, financial and legal burdens of providing permanent homes for children); *see also In re Guardianship of D.*, 169 *N.J.Super.* 230, 241–42 (Camden County Ct.1979) (although agency may have placed children in inappropriate foster setting, "[t]he only issue before th[e] court is their best interests, regardless of how the situation arose") (citing *Sorentino I* and *Sorentino II* ).

Finally, what concerns us most about the case is that there was simply no evidence of any realistic likelihood that the parents would ever be capable of caring for the children.[12] We

---

[12]The only witness who expressed any hope for the parents was Dr. Frank Dyer, a clinical psychologist. Dr. Dyer recommended returning the boys to the parents subject to intensive supervision by DYFS including at-home monitoring of the children and behavioral and parental counseling for the parents. He qualified his recommendations, however, by noting that he was denied access to DYFS files and his "observations and conclusions [were] therefore given under the assumption that no decisive material facts have been withheld * * *." Dr. Dyer therefore reached his conclusion without the benefit of a great deal of background information, including, apparently, the existence of the two daughters, the history of the family and its experience with the Division, and the psychological reports on the children.

cannot determine how much the inability of the parents to transfer affection or care to their children may be attributed to the parents' being short-changed by either nature or society. We are confronted with a situation in which children have been injured. We know that we must balance this injury with the realization that the natural family or its extension will, in many cases, be the best resource that society can afford children. But here there is simply no evidence that the parents will be able to care for the children in the near future. Time is running out for these children.

We realize too that there is a danger here in not recognizing the sense of betrayal that disadvantaged people must feel in dealing with a large governmental agency like DYFS. Respondents were described as having a "sour grapes" attitude about what was going on and having "never learned" from their own mistakes or difficulties. They went to this agency for help and were understandably stunned when their children were taken from them. We have no desire to blame parents in such a situation.

 As regrettable as it may be, there are some circumstances in which the failings of parents cannot excuse their causing harm to their children.[13] The question is not one of being better parents or having a better attitude; any question

---

[13]As noted, both Robert and Adrian have severe limitations. The psychologist retained by them placed Robert's IQ at 76 and Adrian's IQ at 68; they are therefore on the borderline of classification as "mildly" retarded. *See City of Cleburne v. Cleburne Living Center*, 473 *U.S.* ——, —— n. 9, 105 *S.Ct.* 3249, 3256 n. 9, 87 *L.Ed.*2d 313, 322 n. 9 (1985). "[I]t may be contended that most natural mothers who fail to plan for their own children are subject to some form of mental disturbance; if mental inadequacy were to be considered an acceptable excuse for failure to plan [for the future of the child] the scope of the statutory provision would be narrowed to a point of near practical uselessness." *In re Hime Y.*, 52 *N.Y.*2d 242, 250–51, 418 *N.E.*2d 1305, 1308–09, 437 *N.Y.S.*2d 286, 290 (1981); *see also In re Guardianship of D.N.*, 190 *N.J.Super.* 648, 650–51, 653–54 (Monmouth County Ct.1983) (although retarded parents were entitled to services to aid in raising their children, children's needs must be given first priority).

of the parental role is oriented only to the prediction of the future condition of the child. Parental behavior is relevant only insofar as it indicates a further likelihood of harm to the child in the future. Parents are not to be adjudged unfit because they lack resources or intelligence, but only by reason of conduct detrimental to the physical or mental health of the child, specifically in the form of actual or imminent harm. Children are therefore not removed from their parents absent such a showing of harm. *See, e.g., Alsager v. District Court, supra,* 406 *F.Supp.* at 22.

No one is a winner in litigation of this type. "[G]iven the need for continuity, the child's sense of time, and the limits of our ability to make long-term predictions, [the best interests of the child] are more realistically expressed as the least harmful or least detrimental alternative." Solnit, *Psychological Dimensions in Child Placement Conflicts, supra,* 12 *N.Y. U.Rev.L. & Soc.Change* at 499. In this case, we believe that the Division presented a clear and convincing case under *N.J. S.A.* 30:4C–15(c) that the health and development of the minor children have been substantially impaired; [14] that there was no showing that the parents would be able to eliminate the potential for harm to their children in the near future; that the agency had considered alternatives to termination during the period between 1978 and 1984 and that there was a showing that the children were still adoptable and capable of a permanent placement. That evidence would have sustained a judgment of termination.

---

[14]Although there was no direct evidence of injury to Joseph, it would make no sense to wait until he had been injured to decide the issue. *See, e.g., In re Custody of Minor,* 377 *Mass.* 876, 881, 389 *N.E.2d* 68, 73 (1979) (court need not wait until presented with maltreated child before it decides necessity of "care and protection"); *see also In re J.A.J.,* 652 *S.W.2d* 745, 749 (Mo.Ct.App.1983) ("[a]lthough there was no evidence of any direct physical or emotional harm * * *, to require this child to suffer the fate of his siblings prior to termination of parental rights would be a tragic misapplication of the law").

The trial court here, however, relied on inappropriate factors in reaching its determination. The court emphasized that respondents were disadvantaged and DYFS had difficulties in placing the children. These are not legal factors relevant to the four-part standard for termination except insofar as the parents' condition might bear upon their ability to cease to harm their children. *See, e.g., In re Guardianship of R., supra*, 155 *N.J.Super.* at 194–95 (absence of moral culpability or fault on the part of parents not conclusive in determining "best interests" of child). Had the court made affirmative findings that the children had not suffered substantial emotional or developmental injury, that the parents would soon resume an appropriate nurturing role with assistance from DYFS or another agency, or that termination would affirmatively harm the children, such findings could warrant the disposition made. However, as noted, we do not read the trial record or the opinion below to embrace these findings.

We have been requested to enter judgment directing the termination of parental rights. We believe that "[a] proceeding to terminate parental rights involves the State's intrusion into the most fundamental and private of social bonds—that of the family. The warmth and complexity of such relationships should not be assessed against the typed words of a cold record." *In re Michael B.*, 58 *N.Y.*2d 71, 75, 445 *N.E.*2d 637, 639, 459 *N.Y.S.*2d 254, 256 (1983) (Cooke, C.J., concurring). We are therefore reluctant to enter the final judgment without a personal assessment of the relationship.

Because the trial judge has heard this evidence and may have a commitment to its findings, we believe it is best that the case be reconsidered by a new fact-finder. *See In re Guardianship of R., supra*, 155 *N.J.Super.* at 195 (termination case assigned to new judge because "[t]he judge who heard the matter below has already engaged in weighing the evidence and has rendered a conclusion on the credibility of the Division's witnesses"). Although the record is extensive, there are only

two days of actual trial transcripts and four volumes in the appendix containing the reports. A good deal of time can be preserved if the parties can meet and agree on the use of this information.[15] We are extremely concerned that this matter be brought to a swift conclusion.[16] Hence, we direct that on remand the matter be specially assigned to a new judge for expeditious disposition.

As noted, after the trial below Ennett and Kimberly's foster mother died, and the situation may be better crystalized now after this relatively brief period of time. Because of our familiarity with this record, we will entertain consideration of a petition for direct certification if any party believes it necessary to appeal from the disposition on the remand.

The judgment of the Appellate Division is reversed. The matter is remanded for further proceedings in accordance with this opinion.

*For reversal and remandment* —Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN and GARIBALDI—6.

---

[15]To assist the trial court, the parties could agree on a summary of the relevant contents of the caseworkers' notes of contact visits and other relevant events. A critical "inquiry report," pertaining to the events surrounding Jacob's death, was barely legible. The 1984 "Guidelines for the Guardianship Process," approved by this Court and DYFS, appropriately suggest including a "Summary of the Case Records" with the complaint. *See also N.J.S.A.* 30:4C–16 (summary of Division's records shall be filed with a petition for termination of parental rights).

With respect to the expert testimony, the parties should resolve, by pretrial motion, the admissibility of certain opinions of a vision-impaired expert based upon visual data furnished to him. *See Evid.R.* 56(2) (expert witness may base opinion on data "made known to him at or before the hearing"). In addition, Dr. Dyer should promptly familiarize himself with the full record and should be available to testify at the call of either party or the court.

[16]At oral argument, the law guardian for the children expressed reservation about a remand that she believed might take up to 18 months. We would find such a delay highly unacceptable.

*For affirmance* —None.

Justice STEIN, did not participate.