806 A.2d 408

NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, PLAINTIFF–RESPONDENT, v. R.G., DEFENDANT–MOVANT,IN THE MATTER OF THE GUARDIANSHIP OF G.I.M., J.M.M., AND J.C.M., MINORS.

Superior Court of New Jersey
Appellate Division

Submitted September 4, 2002—Decided September 25, 2002.

Before Judges KESTIN, EICHEN and FALL.

*Peter A. Garcia,* Acting Public Defender, attorney for movant (*Deborah C. Collins,* Deputy Public Defender, on the motion).

*Peter C. Harvey,* Acting Attorney General, attorney for respondent (*Christian A. Arnold,* Deputy Attorney General, on the opposing brief).

*Peter A. Garcia,* Acting Public Defender, Law Guardian for the minors (*Phyllis G. Warren,* Assistant Deputy Public Defender, on the opposing certification).

The opinion of the court was delivered by

FALL, J.A.D.

In this guardianship case R.G., natural mother of G.I.M., J.M.M. and J.C.M., moves for leave to file a notice of appeal *nunc pro tunc* from an order entered in the Family Part on August 16, 2001, terminating her parental rights to these three children. R.G.'s motion raises significant issues and concerns of both a procedural and substantive nature.

The following history is relevant to our resolution of this motion. G.I.M. was born on April 6, 1997; J.M.M. on June 1, 1998; and J.C.M. on September 11, 1999. R.G. is the natural mother of the three children, and G.M. is the natural father. The two parents never married and lived intermittently with each other for several years up until G.M.'s incarceration some time in 1999. They have not resided together since that time and, subsequent to his release from prison on parole some time in 2000, G.M. formed another relationship and married that person.

R.G. has been diagnosed as suffering from a chronic paranoid schizophrenic disorder that has caused her to be hospitalized on three occasions. Based on that psychiatric history, various domestic violence issues between the parties, housing instability, and G.M.'s incarceration, the New Jersey Division of Youth and Family Services filed a child abuse and neglect complaint in the Family Part against both parents on or about September 11, 1998 under docket number FN–20–21–99W, seeking custody of the children.

An order was entered in that action vesting custody of the children with DYFS; G.I.M. and J.M.M. were placed into foster care. When J.C.M. was born, she was also placed into foster care. To this date, all three children continue in separate foster homes, and their foster parents have signified their desire to adopt the children.

After failed attempts to provide services to the parents, DYFS filed a guardianship complaint in the Family Part against R.G. and G.M. on March 27, 2000, under docket number FG–20–55–00, seeking an order terminating their parental rights as to all three children. Both parents participated in that case and were represented by counsel designated by the Office of the Public Defender.

The issues in the guardianship complaint were tried in the Family Part between August 1 and 7, 2001. On August 9, 2001, the trial judge placed her factual findings and conclusions on the record, ruling DYFS had established by clear and convincing evidence each part of the four-prong test enumerated in *N.J.S.A.* 30:4C–15.1(a), and that the termination of the parental rights of R.G. and G.M. was in the best interests of the children. *See also New Jersey Div. of Youth and Family Servs. v. A.W.,* 103 *N.J.* 591, 602–12, 512 *A.2d* 438 (1986).

After the judge had rendered her oral decision, the transcript of that hearing discloses significant colloquy between the court and all counsel making clear the intent of both parents to appeal the court's decision. The formal order for guardianship, embodying a judgment terminating their respective parental rights, was entered on August 16, 2001.

On September 13, 2001, R.G. executed a form provided by the Office of the Public Defender, entitled "Notice of Right to Appeal—DYFS Cases." R.G.'s signature on the form was witnessed by her trial counsel. By execution of the form, R.G. acknowledged her right to appeal the order of termination within forty-five days. She specifically signified her desire to appeal from the August 16, 2001 order and requested representation thereon from the Office of the Public Defender.

A notice of appeal was filed on behalf of G.M., represented by counsel designated by the Office of the Public Defender. That appeal was perfected, the issues were briefed, and the matter was submitted to this court for decision on February 6, 2002. On March 5, 2002, we filed a written opinion, affirming that portion of the August 16, 2001 order terminating G.M.'s parental rights as to all three children. *DYFS v. G.M.*, A–0083–01T4 (Mar. 5, 2002). G.M.'s petition for certification was denied by the Supreme Court on June 4, 2002.

R.G.'s motion for leave to file a notice of appeal *nunc pro tunc* was filed on August 13, 2002, nearly a full year after entry of the August 16, 2001 order terminating her parental rights. Assistant Public Defender Gillian A. Swanson, employed in the Parental Representation Unit of the Public Defender's Office, submitted a certification in support of R.G.'s motion.

In her certification, Ms. Swanson explained that on or about July 15, 2002, her Unit received a telephone call from R.G., inquiring about the status of her appeal. A review of the Unit's case management system disclosed that no appeal had been filed on behalf of R.G. A further investigation led to retrieval of R.G.'s trial case file from storage, and "[a] review of the attorney's file revealed a signed notice of right to appeal form completed by [R.G.] on September 13, 2001."

By way of further explanation, Ms. Swanson certified:

However, [R.G.'s] assigned pool attorney never requested an appeal on behalf of [R.G.] from our office. There were no notes, correspondence, ... or other documents to indicate that [R.G.'s] assigned pool attorney ever did anything in furtherance of [R.G.'s] right to appeal or that she ever advised the Office of the Public Defender that [R.G.] had requested our services on appeal. As such, the file was administratively closed and stored without action.

In her certification, Ms. Swanson noted that the Office of the Public Defender did process and handle an appeal on behalf of the father, G.M. Ms. Swanson urges that the instant motion be granted on the basis that "[t]he failure to timely process and request an appeal on behalf of [R.G.] is in no way attributable to the defendant, but rather for the reasons stated herein."

In opposition to the motion, DYFS argues that R.G. has failed to show good cause for allowing her appeal to proceed, and urges we deny her the requested *nunc pro tunc* relief. DYFS notes that G.I.M. and J.M.M. have resided in their current foster placements for a period in excess of four years, and J.C.M. has resided in her foster home since shortly after her birth on September 11, 1999. DYFS states all three children are poised to be adopted by their respective foster parents, and that further delay prejudices the children's right to permanency. DYFS further asserts that R.G. has failed to demonstrate that the questions involved in her appeal are "substantial and meritorious."

In joining DYFS' opposition to R.G.'s motion, the Law Guardian argues that to grant this motion would run contrary to "the public policy of establishing permanency and stability for children created by the federal Adoption and Safe Families Act of 1997, conforming state legislation." The Law Guardian notes that R.G. has provided no explanation "to explain why she waited for such an extended period of time before inquiring as to the status of her case[,]" and attributes such inaction to parental indifference.

*Rule* 2:4–1(a) requires appeals from final judgments be "taken within 45 days of their entry." *R.* 2:4–4(a) authorizes extension of that 45–day period "upon a showing of good cause and the absence of prejudice, . . . for a period not exceeding 30 days, but only if the notice of appeal . . . was in fact served and filed within the term as extended."

It is clear that R.G.'s application does not qualify within the express terms of *R.* 2:4–4(a). However, that fact does not end our analysis.

In *State v. Altman,* 181 *N.J.Super.* 539, 438 *A.2d* 576 (App.Div. 1981), a criminal judgment of conviction was entered on May 4, 1979, on defendant's *non vult* plea to a charge of murder while armed. *Id.* at 540, 438 *A.2d* 576. Nearly two and one-half years later, defendant moved for leave to file a notice of appeal *nunc pro tunc. Ibid.*

Relying upon a "NOTICE TO APPELLATE BAR" issued by our Supreme Court, 100 *N.J.L.J.* 1208 (1977), that provided for the relaxation of *R.* 2:4–4(a) "in favor of allowing an out-of-time appeal nunc pro tunc on behalf of an indigent criminal defendant in any case where it satisfactorily appears that the defendant, personally, within time, requested his trial counsel or the Public Defender's Office to file an appeal on his behalf[,]" we ruled that "only a satisfactory demonstration of defendant's timely request of counsel to file an appeal on his or her behalf ... obligate[s] us to relax the rule and grant leave irrespective of the lateness of the hour." *Id.* at 541, 438 *A.2d* 576. Accordingly, we held that "the sole determinant on a motion by an indigent criminal defendant for leave to file a notice of appeal *nunc pro tunc* is whether that defendant asked either private counsel or a Public Defender, within time, to file such a notice for him. Resolution of that factual inquiry decides the motion." *Ibid.* We routinely follow *Altman* and the Court's "Notice" in criminal matters and relax *R.* 2:4–1(a) in appropriate circumstances. *See State v. Simmons,* 331 *N.J.Super.* 512, 517, 752 *A.2d* 724 (App.Div.2000).

Our Supreme Court has not issued a similar notice concerning relaxation of *R.* 2:4–4(a) in guardianship appeals. However, "any rule may be relaxed or dispensed with by the court in which the action is pending if adherence to it would result in an injustice." *R.* 1:1–2. Certainly, recourse to the relaxation provision of this rule should be sparing. *Oliviero v. Porter Hayden Co.,* 241 *N.J.Super.* 381, 387, 575 *A.2d* 50 (App.Div.1990).

In a criminal case, it would appear that the factors leading to relaxation of the time restrictions imposed by *R.* 2:4–1(a) and *R.* 2:4–4(a) include the significance or stigma of a criminal conviction; the far-reaching consequences, including the loss of liberty through incarceration; an affirmative act by the defendant to counsel signifying his or her intent to appeal; and indigency.

In a guardianship appeal, there are certain unmistakable similarities. As with indigent criminal defendants, indigent parents whose parental rights have been terminated are entitled to repre-

sentation by the Office of the Public Defender. *N.J.S.A.* 30:4C-15.4; *see also In re Guardianship of Dotson,* 72 *N.J.* 112, 118–19, 367 *A.*2d 1160 (1976) (noting that although denominated civil, a guardianship case is almost quasi-criminal in nature, requiring DYFS to bear the cost of the transcript on the indigent parent's appeal). Accordingly, the appeal process for indigent criminal and indigent guardianship appeals is parallel, embodying similar procedural due process values.

Here, R.G. is indigent and she clearly signified her intention to appeal and requested Public Defender representation within the time prescribed by *R.* 2:4–1(a). Additionally, the order of guardianship severed her parental relationship forever with her three children, a far-reaching and severe consequence of constitutional dimension. *See Santosky v. Kramer,* 455 *U.S.* 745, 753, 102 *S.Ct.* 1388, 1394, 71 *L.Ed.*2d 599, 606 (1982); *In re Guardianship of K.H.O.,* 161 *N.J.* 337, 346, 736 *A.*2d 1246 (1999). Both the Federal and State Constitutions protect the inviolability of the family unit. *Stanley v. Illinois,* 405 *U.S.* 645, 651, 92 *S.Ct.* 1208, 1212–13, 31 *L.Ed.*2d 551, 558–59 (1972); *K.H.O., supra,* 161 *N.J.* at 346–47, 736 *A.*2d 1246.

However, government "is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized." *Parham v. J.R.,* 442 *U.S.* 584, 603, 99 *S.Ct.* 2493, 2504, 61 *L.Ed.*2d 101, 119 (1979) (citing *Wisconsin v. Yoder,* 406 *U.S.* 205, 230, 92 *S.Ct.* 1526, 1540, 32 *L.Ed.*2d 15, 33 (1972)). The State as *parens patriae* may act to protect children from serious physical and emotional harm. This may require a partial or complete severance of the parent-child relationship. However, "[f]ew forms of state action are both so severe and so irreversible." *Santosky v. Kramer, supra,* 455 *U.S.* at 759, 102 *S.Ct.* at 1398, 71 *L.Ed.*2d at 610.

Here, the balance between R.G.'s fundamental parental rights and the State's *parens patriae* responsibility to the children, measured by the four-prong "best interests" test set forth in *N.J.S.A.* 30:4C–15.1(a), *see also A.W., supra,* 103 *N.J.* at 602–12,

512 *A*.2d 438, was struck by the trial court in favor of the termination of R.G.'s parental rights. Within forty-five days of the August 16, 2001 order of guardianship, R.G. clearly signaled her desire to appeal and requested representation by the Public Defender's Office. Through the inadvertence of others, the notice of appeal was not filed. Although a significant period of time elapsed before R.G. inquired about the status of her appeal, the record discloses that R.G. has a diagnosed psychiatric disorder, one of the several bases upon which DYFS founded its request for guardianship.

In a criminal appeal, the balance is struck between a defendant's timely request that counsel file an appeal, given the consequences of a criminal conviction, with the right of the public and victim to finality. In a guardianship appeal, the balance is between the right of a parent to appeal the termination of his or her fundamental parental rights, and the rights of the children to finality and permanency in light of the clear public policy set forth in the federal Adoption and Safe Families Act (ASFA), *Pub.L.* 105–89, *eff.* Nov. 19, 1997, codified at 42 *U.S.C.A.* § 675(5)(E) (promoting stability and permanence for abused and neglected children by requiring timely decision-making in proceedings to determine whether children can safely return to their families or whether they should be moved into safe and stable adoptive homes or other permanent family arrangements outside the foster care system), and implemented in New Jersey by *L.* 1999, *c.* 53, *eff.* Mar. 31, 1999, pertinently amending various provisions contained in Title 30, Chapter 4C.

Additional factors in considering a *nunc pro tunc* appeal application in a guardianship case are whether permanency has been achieved, *i.e.*, adoption proceedings have been finalized; the effect that further delay will have on the specific children involved; whether the parent made a timely request of counsel that a notice of appeal be filed; and whether the parent seeking to file a late appeal bears some responsibility for the delay.

Here, in balancing these factors, we conclude that the time provisions contained in *R.* 2:4–1(a) and *R.* 2:4–4(a) should be relaxed and R.G. granted leave to file a notice of appeal *nunc pro tunc.* The Office of the Public Defender established a procedure for parents to signify their desire to file an appeal. R.G. followed that procedure and placed her trust in the Public Defender's Office, a governmental entity, to perfect and prosecute her appeal. That did not occur. We cannot attribute to R.G. any responsibility for that failure or for the delay, particularly given her documented psychiatric condition. Although the foster parents are desirous of adopting the children, and DYFS is poised to file approved agency adoption proceedings, as yet no adoption action has been filed. The record supports a conclusion that the children are thriving in their foster placements, and we cannot surmise that the children's right to permanency will be jeopardized by allowing R.G.'s appeal to be considered. Moreover, we can ameliorate any prejudice inherent by delay by accelerating this appeal, particularly since the required transcripts are already available from G.M.'s appeal in A–0083–01T4.

We pause, however, to note that the circumstances that led to the necessity for this motion might have been avoided through adoption and implementation of a simple check-and-balance system. Here, there were "red flags" that should have alerted the Public Defender's Office, and perhaps DYFS, to the potential problem. The father, G.M., filed an appeal. A reading of the transcript of the August 9, 2001 hearing clearly discloses that R.G. intended to appeal and would be signing the internal notice form so indicating. The permanency goal of DYFS was termination of the parents' parental rights to a conclusion. In light of the colloquy at the conclusion of the judge's oral opinion concerning the contemplated appeal by both parties, when the appeal of only one parent was perfected, a simple inquiry of R.G., or her trial counsel, would have disclosed that R.G. had executed the notice form signifying her intention to appeal.

In the future, it is suggested that when an order of guardianship terminates the parental rights of both parents, and only one parent files a notice of appeal, inquiry should be made at that time as to whether the notice form has been completed by the other parent signifying that other parent's desire to appeal. Implementation of such a procedure should eliminate a repetition of the circumstances that gave rise to this motion.

This court, with the cooperation, input and assent of the Office of the Attorney General, the Office of the Public Defender, the Office of the Law Guardian, and DYFS, has adopted and implemented an administrative protocol for the expedited processing of termination of parental rights proceedings, child abuse and neglect cases, adoption petitions and other children-in-court matters. Incorporation of the foregoing suggestion into that administrative protocol may be an appropriate method for addressing the problems highlighted by the circumstances of this motion.

R.G.'s motion to file a notice of appeal *nunc pro tunc* is granted. The appeal is accelerated, and the Clerk shall issue a brief scheduling order designed to calendar this appeal within ninety days. The Public Defender's Office shall forthwith assign counsel for R.G., and advise the Clerk's Office of that assignment.