**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4767-15T3
            A-4768-15T3

DIVISION OF CHILD PROTECTION
AND PERMANENCY,

       Plaintiff-Respondent,

  v.

S.C. and A.A.,

       Defendants-Appellants.

_____

IN THE MATTER OF THE GUARDIANSHIP OF
S.A., R.A., R.C., P.C. and D.C.,

       Minors.

_____

       Submitted October 17, 2017 — Decided October 24, 2017

       Before Judges Fisher and Moynihan.

       On appeal from the Superior Court of New
       Jersey, Chancery Division, Family Part, Essex
       County, Docket No. FG-07-0255-15.

       Joseph E. Krakora, Public Defender, attorney
       for appellant S.C. (Albert M. Afonso,
       Designated Counsel, on the brief).

       Joseph E. Krakora, Public Defender, attorney
       for appellant A.A. (Susan P. Gifis, Designated
       Counsel, on the brief).

Christopher S. Porrino, Attorney General, attorney for respondent (Andrea M. Silkowitz, Assistant Attorney General, of counsel and on the brief; Jonathan Villa, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Cory H. Cassar, Designated Counsel, on the brief).

PER CURIAM

Defendants S.C. (Steven) and A.A. (Anna) are the parents of five minor children: S.A. (Stanley), born in 2001; R.A. (Roberta), born in 2002; R.C. (Rhonda), born in 2004; P.C. (Paul), born in 2007; and D.C. (Daniel), born in 2013.[1] The Division of Child Protection and Permanency commenced this action and, after a four-day trial, secured the termination of Steven and Anna's parental rights to all five.[2]

In these consolidated appeals, Steven argues the judge erred in finding the Division proved the second, third and fourth prongs of the statutory termination test and particularly focuses on his parental rights to Paul. Anna argues the evidence failed to support the judge's findings on all four statutory prongs. In applying our

[1] All names used are fictitious.

[2] Defendants also have two adult children (born in 1991 and 1992), who were residing in the home at the time of the circumstances in question; their rights and interests are not the subject of this action or these appeals.

A-4767-15T3

familiar deferential standard of review, we reject Steven and Anna's arguments and affirm in all respects.

Parents have a constitutionally protected right to the care, custody and control of their children. Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 1394-95, 71 L. Ed. 2d 599, 606 (1982); In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). "The rights to conceive and to raise one's children have been deemed 'essential,' 'basic civil rights . . .,' and 'rights far more precious . . . than property rights.'" Stanley v. Illinois, 405 U.S. 645, 651, 92 S. Ct. 1208, 1212, 31 L. Ed. 2d 551, 558 (1972) (citations omitted). "[T]he preservation and strengthening of family life is a matter of public concern as being in the interests of the general welfare." N.J.S.A. 30:4C-1(a); see also K.H.O., supra, 161 N.J. at 347.

The constitutional right to the parental relationship, however, is not absolute. N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 553 (2014); N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 599 (1986). At times, a parent's interest must yield to the State's obligation to protect children from harm. N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 397 (2009); In re Guardianship of J.C., 129 N.J. 1, 10 (1992). To effectuate these concerns, the Legislature created a test for determining when a parent's rights must be terminated in a child's

best interests. N.J.S.A. 30:4C-15.1(a) requires that the Division prove by clear and convincing evidence the following four prongs:

> (1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm . . .;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.

See also A.W., supra, 103 N.J. at 604-11.

By way of a thorough oral decision, Judge Stephen J. Bernstein found the Division demonstrated, by clear and convincing evidence, that all four prongs supported termination of both defendants' parental rights to all five children. We briefly and separately examine the judge's findings on each prong.

I

Steven doesn't contest the first prong, and Anna argues only that the guardianship complaint failed to identify "specific" harms or risks of harm to the children that arose from her alleged

incapacity for adequate parenting. Specificity at that stage, however, was not required.

The evidence overwhelmingly supports a finding that the children were endangered by their parents' unfitness. The children's need for close and constant supervision due to their severe developmental disabilities was not met. They often arrived at school dirty, disheveled, and sometimes with minor injuries. Anna's incapacity as a parent was further demonstrated by the home's chaotic condition. And Steven's testimony confirmed that he did not believe he should help Anna in fulfilling their parental obligations. The evidence also demonstrated Steven was emotionally abusive toward Anna and the children. Caseworkers witnessed Steven's hostility and aggressiveness toward Anna, and they faced the same aggression from Steven when visiting the home.

Dr. Gerard Figurelli's psychological evaluation confirmed Anna was unable to provide adequate parenting on her own, and that cognitive and psychological limitations made her unlikely to benefit from parenting instruction or psychiatric treatment.[3] Dr.

---

[3] To be more precise, Dr. Figurelli described Anna as "somewhat labile and unstable in mood" and found her responses were "disjointed and rambling." He also found Anna "somewhat cognitively limited." Her nonverbal intelligence test result was "within the low borderline to mildly disabled range of intellectual functioning," her judgment was "concrete but adequate," and her manner was "somewhat strange and peculiar." Dr. Figurelli

John Quintana's psychological evaluation found that Steven's rigidity and intolerance made him abusive and controlling, which contributed to the dysfunctional and potentially harmful family situation.

Dr. Figurelli opined that the "family home environment" and defendants' "volatile relationship" with each other posed an "imminent and immediate risk of harm/danger to the safety of the children." Those circumstances, which reflected defendants' parental inadequacies, arose from the parental relationship rather than from outside forces and manifested at the time of the children's removal. At that time, Anna reported that Steven had become very violent during the preceding weekend and threatened to kill her.

Steven and Anna's unfitness as parents, coupled with their troublesome parental relationship, posed a danger to the children's safety, health, or development.

II

The Supreme Court has recognized that the second statutory prong focuses not on whether the parents "are themselves unfit or

---

concluded that Anna could not "adequately and independently parent her 7 children" in "a consistently adequate and stable manner over time." She depended on Steven for "the responsibilities and chores of daily adaptive living" and was unlikely to be able to "consistently manage" them on her own.

whether they are the victims of social circumstances beyond their control," but on "whether it is reasonably foreseeable that the parents can cease to inflict harm upon the children entrusted to their care." A.W., supra, 103 N.J. at 607. "No more and no less is required of them than that they will not place their children in substantial jeopardy to physical or mental health." Ibid.

The Court cautioned that "the price of focusing on the plight of the parents . . . is that the child is kept in waiting for what the decision-makers view as the ideal or best placement." Id. at 601-02. What most concerned the A.W. Court was the lack of evidence of "any realistic likelihood that the parents would ever be capable of caring for the children." Id. at 614. Even when parents are not blameworthy because they were "shortchanged by either nature or society," this prong is satisfied when their behavior "indicates a further likelihood of harm to the child in the future." Id. at 615-16.

The trial judge's findings on the second prong were based firmly on evidence he found clear and convincing and met the requirements of the legal principles discussed above. Steven may have completed his batterer's intervention program, but he admitted what he learned was insufficient. This was demonstrated at trial; Steven explained that the techniques he was taught did not prevent an earlier outburst in court when provoked by what he

viewed as "so many strong lies," especially about the children's condition. His testimony that the children had nothing more than a "disease" that could be "cured" with rubbing alcohol or "fixed" with "education" further demonstrated his inability or unwillingness to understand the nature of the children's disabilities and their special needs.

Parenting training also provided little benefit. Although Steven completed the program, the provider observed that he still needed counseling to accept responsibility for his contribution to the situation. Steven stated his intention to pursue counseling, but there was no indication he did. His testimony showed a continued unwillingness to provide the care, of which Anna was incapable, by insisting Anna would continue to provide all the caregiving. He stated she could do so because a person can "force [one's] self to do it."

Anna likewise showed little interest in or ability to benefit from services. She exhibited only interest in domestic violence counseling because she believed it would lead to her relocation to a separate residence. She did not start couples counseling, and she rejected individual counseling during the intake process seven months before trial. The provider of the group-parenting training, which Anna completed, called it "unproductive" because Anna's "cognitive issues" kept her from staying focused. The provider of

the individual parenting training, which Anna completed a month before trial, similarly noted Anna was "not capable of utilizing her new skills with her children."

Anna's remaining argument — that the children improved upon receiving services not previously provided following their removal — is also unavailing. This improvement only highlighted the importance of the services from which Anna was unwilling or unable to benefit and demonstrated that the delay in better caregiving would have caused further harm if the children remained in her custody.

In short, we find no merit in both defendants' arguments about the second prong. The judge observed that Steven and Anna had unduly focused on their resentment and on expressing it constantly, even during visitations, which should have been devoted to the children and not their grievances. He found that Steven learned nothing during the pendency of this case; despite parenting classes, Steven continued to believe the children and Anna were "fine" and there were no problems other than those caused by the Division's interference. The judge concluded that both parents failed to fully comply with services and were continuing to harm the children. These findings are supported by evidence the judge was entitled to characterize as clear and convincing.

Steven claims the judge erred in finding the Division made reasonable efforts to achieve reunification by providing him and the children with appropriate services. He argues the Division should have offered a program tailored for parents of children with autism or similar developmental disabilities, with an educational component. Based on the demonstrated value of the therapeutic visitation, Steven argues the Division should have offered it much earlier.

Anna claims the judge erred by finding the services offered to promote reunification were reasonable despite the failure to adjust those services to her disabilities and the requirements of the Americans With Disabilities Act, 42 U.S.C.A. §§ 12101-12213. She argues the reasonableness of the services must be measured against the needs of the particular family and parent, and therefore the services offered were inadequate because they were generic rather than molded to someone with her particular cognitive and psychological impairments.

We find insufficient merit in both defendants' arguments on this third prong to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E). We add only a few brief comments.

In finding by clear and convincing evidence that the Division had made "more than reasonable efforts" to provide services that

might lead to reunification, the judge recognized that the Division offered "numerous services" and "struggled" with both Steven and Anna to secure their compliance. The judge recognized that defendants complied with some services but found "there[] [are] so many services . . . still necessary."

The judge also credited those expert opinions that asserted Anna was "really not going to benefit from these services," and the "only possibility" was for Steven to get "his act together" and "take the lead in caring for these children"; the judge found nothing to suggest Steven would do so, nor that he would develop an understanding that the children's needs and Anna's limitations required him to do so. The judge further observed that services had not generated "any benefit . . . in the last two years."

The judge also viewed the therapeutic-visitation argument as "a complete and utter red herring" because it served only the parents. That service, he determined, "wasn't going to make them better parents" when parenting classes and the other services they were willing to accept had failed to do so. Instead, it was just a way to maintain "some limited visitation" by keeping defendants "under control . . . without causing a toxic situation."

Finally, the Division does not have to make more than a reasonable effort "under the circumstances to accommodate [a parent]'s disabilities," and the Division's proofs on the third

11

prong do not fail simply because the Division's reasonable efforts "did not bear fruit." N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 442 (App. Div. 2001), certif. denied, 171 N.J. 44 (2002). "The diligence of [the Division's] efforts on behalf of a parent is not measured by their success" but "against the standard of adequacy in light of all the circumstances of a given case." In re Guardianship of D.M.H., 161 N.J. 365, 393 (1999).

IV

Steven claims the judge erred on the fourth prong by finding termination would not do more harm than good, especially for Paul. Steven argues there was no prospect of adoption or other permanent placement for Paul; that, in his view, made the termination of his parental rights to Paul premature at best.

Anna also claims the judge erred by finding the termination of her parental rights would not do more harm than good. She argues that no expert described the bond between herself and either Roberta or Rhonda as harmful or worthy of termination. She adds that she was unfairly denied the opportunity to assess the strength of Stanley's bond to her and "his ability to function in her home with the new skills that he developed," due to services that had been denied prior to removal. As for Paul, she claims there was no evidence of a bond to anyone outside the family and no expert

opinion to support termination before the identification of an adoptive parent. She argues that Daniel's bond with his foster parents is greater than his bond with her only because the Division failed to provide adequate visitation. And she lastly argues that the judge failed to consider the impact on the children, who had mutual attachments, of losing all connection with each other, except for Roberta and Rhonda.

Other than those comments that follow, we find insufficient merit in these arguments to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E).

The fourth prong of the statutory test, N.J.S.A. 30:4C-15.1(a)(4), "serves as a fail-safe against termination even where the remaining standards have been met." N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 609 (2007). The question is "whether a child's interest will best be served by completely terminating the child's relationship with that parent." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 108 (2008).

A child "deeply needs association with a nurturing adult" and a sense of "permanence in itself is an important part of that nurture." A.W., supra, 103 N.J. at 610. "When a parent has exposed a child to continuing harm through abuse or neglect and has been unable to remediate the danger to the child, and when the child has bonded with foster parents who have provided a nurturing and

13

safe home," the termination of parental rights "likely will not do more harm than good." E.P., supra, 196 N.J. at 108. New Jersey accordingly has a "strong public policy in favor of permanency. In all our guardianship and adoption cases, the child's need for permanency and stability emerges as a central factor." K.H.O., supra, 161 N.J. at 357.

The ultimate determination to be made under the fourth prong "is whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with [the] natural parents than from the permanent disruption of [the] relationship with [the] foster parents." Id. at 355. Weighing the possible harm from termination against the possible harm from a foster placement "is painfully difficult, but it is a decision that necessarily requires expert inquiry specifically directed to the strength of each relationship." J.C., supra, 129 N.J. at 25.

Based on the evidence presented, the judge found termination would not do more harm than good because it provided "the only possibility that these children will reach their full potential and reach permanency." This case, he observed, "really just cries out for these children to finally be in [a] safe, stable, permanent environment where they can do better and thrive," and this goal could not be achieved by a return of the children to their parents.

14

The judge noted that the success of an adoptive home cannot be guaranteed, but even "if one of these adoptive homes should fail," the improvement that each child exhibited after removal revealed they would be "capable of thriving in another home" if need be.

V

Had circumstances remained unchanged, we would not proceed further. The record on appeal, however, contains information that suggests a change in circumstances regarding the status of both Stanley and Paul that potentially may have some bearing on the trial judge's determinations.

A post-termination hearing in January 2017 revealed that Stanley's foster parents had "changed their mind" about adopting him, and that he was "now in a special school" due to his autism. The Division also advised that Paul was placed in the same resource home as David, and the resource parent was willing to adopt both.

Consequently, although we reject all the arguments presented by defendants and affirm the judgment under review, we do so without prejudice to defendants' rights to seek relief from the trial court judgment, pursuant to Rule 4:50, based upon the post-termination circumstances outlined immediately above.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4767-15T3