# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3569-18T3

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

M.L.L.,

     Defendant-Appellant/
     Cross-Respondent,

and

D.Q.T., S.H.B. and D.R.G., Jr.,

     Defendants-Respondents.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF D.I.A.D.Q.T.,
M.G.G., K.D.A.T.,

     Minors/Cross-Appellants,

and

I.Y.S.T., J.S.B. and P.M.B., Minors.

_____

Argued November 19, 2020 - Decided  January 12, 2021

Before Judges Ostrer, Accurso and Vernoia.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FG-07-0037-19.

James D. O'Kelly, Designated Counsel, argued the cause for appellant/cross-respondent M.L.L. (Joseph E. Krakora, Public Defender, attorney; Robyn A. Veasey, Deputy Public Defender, of counsel; James D. O'Kelly, on the briefs).

Casey Woodruff, Deputy Attorney General, argued the cause for respondent Division of Child Protection and Permanency (Gurbir S. Grewal, Attorney General, attorney; Sookie Bae, Assistant Attorney General, of counsel; Katherine Petrie, Deputy Attorney General, on the brief).

Todd Wilson, Designated Counsel, argued the cause for minors/cross-appellants D.I.A.D.Q.T., M.G.G. and K.D.A.T. (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Todd Wilson, on the briefs).

Danielle Ruiz, Designated Counsel, argued the cause for minors J.S.B. and P.M.B. (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Danielle Ruiz, on the brief).

James J. Gross, Designated Counsel, argued the cause for minor I.Y.S.T. (Joseph E. Krakora, Public

2

Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; James J. Gross, on the brief).

PER CURIAM

Defendant M.L.L. appeals from a final judgment terminating her parental rights to six of her seven children, D.I.A.D.Q.T. ("Daniel"), now fourteen years old; M.G.G. ("Martin"), twelve; I.Y.S.T. ("Ilene"), ten; K.D.A.T. ("Kevin"), nine; J.S.B. ("Jade"), eight; and P.M.B. ("Pauline"), six.[1] Her seventh child, a girl almost four, is not involved in this matter. Defendant contends the Division of Child Protection and Permanency failed to prove prongs two, three and four of the best interests standard of N.J.S.A. 30:4C-15.1(a)(1) to (4) by clear and convincing evidence.

The law guardian for Daniel, Martin and Kevin cross-appeals on behalf of the boys, joining in defendant's arguments and contending the severe behavioral and mental health problems the boys suffer, particularly Daniel, make their adoption unlikely, and that all three wish to return to their mother's care. Ilene, separately represented, had been of the same mind as her brothers but has since decided she would prefer to be adopted. Ilene's law guardian has

---

[1] These are fictitious names used to protect the identity and privacy of the parties involved. See R. 1:38-3(d). The children's fathers' rights were also terminated in this action. None has appealed.

A-3569-18T3

thus withdrawn her cross-appeal and supports the Division's arguments here. The law guardian for Jade and Pauline likewise urges affirmance.

Having reviewed the record, we find no basis to second-guess the trial judge's findings as to defendant's unfitness, her inability or unwillingness to remediate the harm she's caused these children, the Division's reasonable efforts to assist defendant in overcoming the problems that led to their placement, and the absence of any alternatives to termination. The only quarrel we have with the trial court's comprehensive and otherwise well-considered opinion is that the court failed to apply the test of the fourth prong — whether "[t]ermination of parental rights will not do more harm than good" — individually as to each of these six children. Although individual consideration of each child is, of course, always essential, N.J. Div. of Youth & Family Servs. v. A.R., 405 N.J. Super. 418, 443 (App. Div. 2009) (noting the four prongs must be evaluated separately as to each child) it was particularly important here because at the time of trial, only one of these children was in a pre-adoptive home.

Based, however, on the unrebutted testimony of the Division's expert regarding the absence of any real bond between defendant and any of the children, and his unequivocal view that the limited risk of harm to each child

A-3569-18T3

posed by termination of defendant's parental rights was far outweighed by the potential for adoption, which is now a very real possibility for the five younger children as all are now living in pre-adoptive homes, we can affirm the decision as to Martin, Ilene, Kevin, Jade and Pauline, notwithstanding that error.

Daniel, however, is a separate case. He has only recently been released from a residential treatment facility. He is now residing in a step-down program in a group treatment home. Daniel's mental health issues and severe behavioral problems have, in the words of his counsel, "sabotaged" his chances of a permanent placement to date. While the evidence in the record would not suggest that defendant is able to assume his care, the court's failure to address specifically whether termination of defendant's parental rights might leave Daniel worse off, compels a limited remand for the trial court to address the fourth prong of the best interests test in light of his, and defendant's, current circumstances.

This is a very old case. It's been tried twice and twice remanded on motion during the pendency of this, the only, appeal for the Division to assess one of defendant's relatives for placement, and for the court to consider the applicability of the Indian Child Welfare Act, the latter issue defendant has

5

now abandoned. The children were removed from defendant's care five years ago in January 2016.

The facts leading up to the removal through the second termination trial are spread across eighty-seven pages of the trial court's written opinion, and we have no need to repeat them here. Suffice it to say that the children were removed because they were dirty and smelled of urine, and defendant had failed to provide them a suitable place to live or to plan for their care, including undertaking such basic tasks as enrolling the older ones in school. The Division had twice previously substantiated defendant for environmental neglect for permitting the children to live in a filthy, fly-infested apartment reeking of animal waste. A notable entry from the case sheets at that time documents that a meeting about the children between defendant and a Division worker had to be conducted outside in late October 2011, because the stench inside defendant's apartment made it difficult to breathe. Child welfare personnel in both New Jersey and Florida, where plaintiff lived for two years between 2013 and 2015, documented defendant's unwillingness to take any initiative in caring for her children, expecting the child welfare agencies in both states to do for her and her children what she was unable or unwilling to do for herself or them.

A-3569-18T3

When Florida's child protective services agency was on the verge of removing the children from her care in late 2015, defendant returned to New Jersey, at Florida's expense, without any money or a place to go. She explained she had returned home expecting her mother to help her. Defendant was ineligible for financial assistance as she had exhausted her benefits and had lost her Section 8 housing, although unable to clearly explain why. She refused to contact shelters for vacancies, complaining it was "tiring calling dead end places" and that she would instead prefer to wait for return calls. She texted the Division worker, saying "if there's any housing [in Morris County] just make it happen because I'm tired and feel sick to keep stressing my body out like this."

The Division arranged for a psychiatric evaluation of defendant during the summer of 2016. The Division's psychiatrist reported that defendant suffered from post-traumatic stress disorder, unspecified bipolar disorder, unspecified anxiety disorder, panic disorder, maladaptive personality traits, cannabis abuse (in remission), and that she had been a victim of domestic violence. He concluded defendant required outpatient mental health treatment and perhaps intensive outpatient treatment but did find cognitive therapy to be advisable given defendant's "cognitive limitations and learning disabilities."

After the Division removed the children, defendant's visits with them were sometimes sporadic and often unfocused, even before she again relocated to Florida in late 2016, with her many times talking on her cell phone or not interacting with the children, who played among themselves. When defendant advised she was moving back to Florida, the Division's court-approved plan was still reunification. Defendant maintained she could access services in Florida, and that a great-aunt could help her with housing to accommodate the children. Despite the Division's expressed reservations about that plan, the court approved it, ordering defendant to execute releases for any program she entered, which the Division would assess to determine whether it met the terms of the existing order for defendant to engage in services.

When, four months later, defendant had not enrolled in services in Florida and had not executed releases, despite another court order and repeated requests, the court in March 2017 approved the change in the Division's permanency plan from reunification to termination. Her visits with the children at that time, which the Division offered to conduct over Skype, were instead limited to conversations over the telephone because of defendant's inability to secure a computer. Workers reported that defendant never initiated

these calls, and when the workers called at pre-arranged times, defendant's phone was many times turned off.

We digress from a chronological rendition of events to address the children's lives in placement, which have often been difficult, largely because of the challenges their behavioral problems presented. Daniel, the eldest, has severe behavioral issues and suffers from encopresis, or fecal incontinence, reportedly caused by psychological or emotional problems. He has been diagnosed with oppositional defiant disorder and attention deficit hyperactivity disorder. When first removed from defendant's care, Daniel and Martin went to live with Martin's paternal grandmother.[2] Within six months, however, she asked that Daniel be removed due to his "defiant" behavior, angry temper tantrums and soiling himself. The Division moved him to a therapeutic resource home, the first of eight such placements. He was later suspended from school and kicked out of camps and clubs because of his angry, aggressive behavior and fighting. Martin also had behavioral issues, although much less severe than Daniel's. He has remained in his grandmother's care since his removal, and his law guardian reports Martin has moved out of a self-

---

[2] Martin's father executed a voluntary surrender in favor of his mother.

contained classroom and become a good student. His grandmother is committed to adopting him.

Ilene and Kevin were initially placed together in a non-relative resource home. At the time of the second trial, Kevin was residing in a treatment home, following a crisis hospitalization in 2017 after he threatened to cut off a classmate's head with a knife. He was being educated in a self-contained classroom and had been in four other placements. Ilene, who also has behavioral issues and mild intellectual disability, likewise received her schooling in a self-contained classroom and cycled through four different placements, including overnight placements. Although her behavior had much improved by the time of the second trial, case management organization services and therapy having been discontinued in 2018, she was still not in a pre-adoptive home.

Jade and Pauline have remained together since being removed from their mother's care. They spent the first two-years post-removal in a pre-adoptive home. Pauline qualified for services, and Jade was receiving therapy and classified as Preschool Disabled. The family relocated to Pennsylvania, however, and was not permitted to take the girls with them.

That disruption was difficult for both children, especially Jade, who has both a learning disability and emotional issues, manifested by anger and aggressive behavior. Jade's behavior by the time of trial, however, was reported to be much better, and she had transitioned to a regular classroom. The Division referred Pauline to a child study team in 2018, and her sibling visits at the Adoption House were temporarily suspended late that year because of her behavior. Although Pauline's behavior can be problematic at times, she has no learning disabilities. Both girls reportedly suffered from bed-wetting. Their initial resource family maintained contact and pursued licensing in Pennsylvania in order to resume custody of the girls. As of the second trial, Jade and Pauline were together in a new, non-adoptive resource home in New Jersey.

Resuming the narrative, shortly after the court approved the plan for termination in March 2017, defendant reengaged in services. Florida family services advised that defendant was in its "intensive program," scheduled to undergo a psychiatric evaluation, receive individual therapy, and get "High Risk Newborn" services, as defendant had recently given birth to her seventh child. By May, Florida officials advised that defendant was living in a shelter

A-3569-18T3

and voluntarily engaging in counseling, psychiatric services and parenting education.

In a psychological evaluation conducted in New Jersey in July, however, defendant told the Division's psychologist, Dr. Yeoman, that the reports of her not enrolling the children in school and neglecting their hygiene were false. She claimed she had enrolled the children in school when they were six weeks old, and that the children's observed hygiene condition was as a result of the unaddressed condition of her prior home. She also denied reports that she had been evicted from several shelters. Defendant told the psychologist the children would not have any difficulty transitioning out of their various resource homes back to her care as they had lived with her all their lives. She reported that Ilene had learning problems, and Jade and Pauline both had learning and behavior problems, the latter of which only started after their removal, and that she had already established specialized treatment for each of them, which no one could verify.

Defendant's scores on intelligence tests reflected below average to average intelligence, and personality tests reflected "substantial narcissistic personality traits" and paranoia, and her clinical symptomatology suggested "labile emotions and frequent mood swings." After observing defendant with

her children, Dr. Yeoman concluded defendant demonstrated no understanding of the children's special needs, that her lenient parenting style would not permit them "to develop internal controls and an understanding of the importance of following rules," and that the amount of structure and guidance she could provide them "would be inadequate for healthy development." He highlighted her failure to take any responsibility for the children's out-of-home placement and her only recent willingness to comply with mental health treatment despite a life-long history of problems.

Most significant, the psychologist noted defendant did not actively demonstrate affection for her children and enthusiasm for interacting with them, notwithstanding she had not seen them for eight months at the time of the evaluation. The children, likewise, demonstrated no reaction to her leaving the room, and did not actively seek her out and express affection for her. Defendant had her newborn with her during the evaluation, and the psychologist observed "on several occasions, the demands of attending to all her children exceeded her abilities, and important needs of her children were neglected." She at one point directed then four-year-old Jade to hold her infant, whom Jade almost dropped, while defendant attended to another child. On another occasion when she left the room with one of the other children,

Martin knocked Kevin to the ground with a heavy toy, the baby started to cry, and Daniel, then ten, was left to attend to her. Dr. Yeoman found no strong, psychologically healthy bond between defendant and any of her six older children, describing her relationship with them as "more consistent with what is often found between a child and an extended family member, such as with an uncle or aunt." In contrast, Dr. Yeoman found Martin securely bonded to his grandmother.

By the time of the first guardianship trial in April 2018, however, the psychologist had somewhat altered his opinion as to defendant's ability to parent her children. He testified he had only recently been provided with updated reports of defendant's participation in services in Florida. Having reviewed those records, which revealed that defendant had been engaged in treatment in Florida for nearly a year, and that Florida's child protective services agency had closed her case, having no concerns about her care of her infant, Dr. Yeoman amended his earlier assessment. Writing in an updated report that it appeared defendant had "demonstrated a greater commitment to treatment than initially indicated," he found the new information "could not be ignored."

Although acknowledging defendant's efforts, the psychologist still maintained he saw no evidence that "defendant has addressed the central issues of her case," or demonstrated the ability to maintain housing or achieve financial stability, and thus his opinion as to Martin, Pauline and Jade remained the same. As to Daniel, Ilene and Kevin, however, the psychologist opined that in light of "their ages and lack of adoptive homes," and defendant's "current commitment to treatment," that allowing defendant "an additional three months to address and remediate the central issues of her case is unlikely to cause them substantial harm."

Thus, although remaining of the view that defendant would be unlikely "to address these issues sufficiently," given that she previously demonstrated no understanding of how her lenient parenting style put the children at risk of harm, was unaware of how she would need to change the way she parented in order "to suit each of her children's special needs" and took no responsibility for the children's initial or continued placement, Dr. Yeoman recommended defendant be given another, limited, chance to show she could be an adequate parent to her three oldest children. He identified seven treatment goals for defendant:

> (1) Gain sufficient understanding of the importance of structure and supervision for all of her children,

especially those with special needs. Demonstrate how she will change her parenting style to suit each of her children's special needs.

(2) Recognize her responsibility for her children's initial and ongoing placement with the Division, identify the personal and parental deficits which contributed to their removal from her care, and demonstrate substantial improvement in those domains.

(3) Demonstrate an appreciation for the difficulties her children would likely encounter if they were transitioned back into her care and develop a plan to sufficiently address these anticipated difficulties.

(4) Demonstrate insight into the impact her mental health had on her ability to parent her children adequately and develop a plan to sufficiently address her mental health issues.

(5) Consistently and actively participate in telephone visitation with her children.

(6) Achieve and maintain housing and financial stability.

(7) Submit to a psychological reevaluation in three months to determine the degree of treatment progress made and if reunification is warranted at that time.

Dr. Yeoman opined that if defendant could not demonstrate substantial progress toward each of those goals within a few months, then the only option for the children achieving permanency would be by termination of her parental rights.

16

Having heard Dr. Yeoman's testimony, the trial judge concluded the Division did not carry its burden on the second and fourth prongs of the best interests standard as to any of the children, and that defendant should be permitted an additional period to demonstrate that she could remediate the harm to the children resulting in their placement.[3] The judge accordingly dismissed the guardianship case and reinstated the Title 30 protective services action. The Division did not appeal that order. The judge further ordered the Division to meet with defendant to formulate a plan in conjunction with the Florida authorities to address Dr. Yeoman's treatment goals for defendant and ordered her to submit to a reevaluation in three months to assess her progress.

Despite some initial efforts, defendant did not make significant progress toward her treatment goals. She missed visits with the children, cancelling

---

[3] The court also declined to terminate the rights of Daniel, Ilene and Kevin's father and Jade and Pauline's father, notwithstanding that it found the Division proved the first three prongs of the best interests standard as to both men, stating "[t]he court does not terminate the rights of one parent when another parent could be fit." The Division did not appeal that order, and thus that ruling is not before us. We accordingly express no opinion on it. But see N.J. Div. of Youth & Family Servs. v. H.R., 431 N.J. Super. 212, 228 (App. Div. 2013) (rejecting defendant's attempt to rely on other parent's defenses to avoid termination of defendant's parental rights) (citing N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 288 (2007) (holding "[p]arental rights are individual in nature and due process requires that fitness be evaluated on an individual basis")).

flights, paid for by the Division, at the last minute,[4] and refused to attend two scheduled reevaluations with Dr. Yeoman. She was also evicted from the shelter where she had been living in Florida, and into which she had planned to move the children, because she failed to keep her room clean. Florida authorities refused the Division's interstate request to inspect the new apartment defendant secured through an anti-homelessness program for its suitability for the children because she would not comply with that state's requirement for the inspection.

Three months after the first guardianship trial, the court approved the Division's permanency plan for termination, and the Division filed a new guardianship complaint. Defendant finally attended a reevaluation with Dr. Yeoman in December 2018, five months after it was first scheduled. Defendant told the psychologist she could temporarily establish all six children with her and her youngest child in her new two-bedroom apartment; that she

---

[4] When she cancelled one visit in June 2018 on the day before she was scheduled to arrive, she texted the worker, "my kids will understand." Upon learning from his resource parent that his mother had cancelled, Daniel had an explosive outburst, cursing and soiling himself. He twice hit the resource parent and threatened to poke her in the eye with a broom he brandished. Although he subsequently calmed down and apologized, the resource mother decided she could no longer care for him and asked that he be removed from her home. Daniel had two overnight placements before being moved to another resource home.

A-3569-18T3

would be offered a larger apartment at the end of her one-year lease; and could never be dropped from the housing program; all of which were contradicted by the program's housing administrator with whom Dr. Yeoman spoke in order to understand defendant's current housing in Florida. After reevaluating defendant, the psychologist opined that she had not demonstrated she could maintain stable housing for herself and her children and was "on a negative trajectory," given that she was already three months behind in her, heavily subsidized, rent in her new apartment and had yet to transfer the utilities into her name as required.

Although Dr. Yeoman acknowledged defendant's compliance with her psychotropic medications, and that she had better insight into the problems that led to the children's removal, he found she continued to not appreciate the likely difficulties her children would encounter were they returned to her care. Moreover, she "continue[d] to be overwhelmed by completing the basic tasks necessary to maintain a stable life and reunification with her children" with only one child in her care — remaining late on her rent, failing to transfer the utilities into her name, and not completing the forms necessary to permit Florida authorities to initiate the home study process. She had also not returned to therapy after completing a six-month program in November 2018.

Defendant's housing program encouraged her to continue counseling, as had Dr. Yeoman, but she didn't follow through. Defendant also cancelled trips to New Jersey to visit her children at the last minute and had never submitted a plan for reunification, despite having five months to do so.

Dr. Yeoman wrote that "[i]f completing these tasks and managing her own life is more than [defendant] could handle," he had "little confidence that she could handle the stress and logistics of caring for six additional children," several with special needs. The psychologist did not undertake an updated bonding evaluation between defendant and her children because he saw no reason to anticipate any change, given how infrequently defendant had visited or spoken with them since his first bonding evaluation. He opined that none of the children would suffer severe and enduring harm were defendant's rights terminated and that doing so would provide the children an opportunity for permanent placement through select home adoption. Dr. Yeoman again repeated his opinion of the strong, psychologically healthy bond between Martin and his grandmother, and that removing him from her care would likely cause him to suffer substantial harm to his development.

At the second guardianship trial, Dr. Yeoman testified consistent with his report, and two Division employees, a supervisor in the adoption unit and a

20

family services specialist, testified to the Division's efforts to provide services, the children's status and the Division's plans to find them permanent homes. The family services specialist also testified to the Division's interactions with the Florida authorities and defendant's case manager in her anti-homelessness program. Included in that testimony was a report received just days before trial that defendant was then behind $480 in her rent and had recently failed a housing inspection for housekeeping issues, including letting her garbage block a neighbor's door. The Florida case manager also advised she had made a referral to child protective services that defendant was failing to provide adequately for her youngest child. The Division witnesses testified the plan for all of the children, but Martin, was select home adoption. The law guardians for the children did not present any witnesses.

Defendant testified in her own behalf. She acknowledged that she was again facing eviction, explaining she had to choose between paying her storage bill and paying her rent. She also admitted she had an open matter with Florida's child protective services agency over her care of her youngest child, had not returned to therapy, and that the Florida authorities had never conducted the home inspection she needed in order to permit the Division to assess her two-bedroom apartment's suitability for seven children.

A-3569-18T3

Based on the facts adduced at trial and his assessments of the credibility of the witnesses who testified, the judge found the Division established all four prongs of the best interests standard by clear and convincing evidence. He relied on his findings from the first trial that defendant had endangered her children by environmental neglect by forcing them to live in unsanitary conditions, and her failure to enroll the older children in school. The judge further found the children's safety, health and development would continue to be endangered by their relationship with their mother based on her inability to maintain a minimal degree of stability in her own life and her inability or unwillingness to provide them a safe and stable home. The judge noted defendant's inability to manage stable housing for herself and one child, finding no evidence that she could somehow more effectively provide for the other six children she had condemned to placement by her neglect and incapacity.

The judge did not find defendant's account of her efforts since the first trial credible, noting "[s]he merely acknowledged a host of unresolved issues and either blamed others or offered a myriad of excuses for things undone." He concluded her testimony revealed her failure to comprehend the impact on the children of having been in placement for well over three years, and that her

22

"plan — just get the kids to Florida [and] everything will be right — lacks insight" into herself and them. Crediting Dr. Yeoman's testimony about the need the children have for permanency, which their mother cannot provide, the judge found further delay would only compound the harm they had already suffered.

Based on the myriad of services the Division provided defendant, including after she relocated to Florida, the judge concluded the Division easily met its obligation to provide her the services she needed to correct the conditions that led to the children's placement. The judge also considered, and rejected, alternatives to termination, including relative placement, long-term specialized care, independent living and, as to Martin, kinship legal guardianship with his paternal grandmother, which was unavailable because she wished to adopt him.

Finally, the judge concluded, based on the unrebutted expert testimony, that termination of defendant's parental rights would not do more harm than good, even as to those children, all except Martin, who were not then in pre-adoptive homes. The judge accepted Dr. Yeoman's testimony that defendant was not then fit to parent her children, and that additional time had not and would not change that, leading the judge to conclude the Division's plan of

23

select home adoption posed less risk to them than continuing their relationship with a parent who could not provide them the permanency they needed.

Our review of a trial court's decision to terminate parental rights is limited. N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448-49 (2012). We generally "defer to the factual findings of the trial court because it has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a 'feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting M.M., 189 N.J. at 293).

Having reviewed this record, we are convinced the judge's findings as to each of the four prongs of the best interests test have ample support in the trial testimony. Defendant's arguments that the Division failed to make reasonable efforts at reunification, failed to timely assess defendant's great aunt Edith as an alternative placement for the children, and that the trial court's findings as to the second and third prongs were thus inadequate are without sufficient merit to warrant any extended discussion here. See R. 2:11-3(e)(1)(E).

Defendant claims the Division spoiled the chance the judge gave her after the first trial to prove her ability to parent her children by failing to transmit Dr. Yeoman's seven treatment goals to her Florida therapist when she

24

started therapy in May 2018. Specifically, defendant argues the family services specialist "testified confidently" on direct that Dr. Yeoman's treatment goals were "submitted" to defendant's Florida service provider, but was forced to concede on cross "that she was not sure if [defendant's] therapist 'actually got Dr. Yeoman's recommendations.'" A review of the transcript and the contemporaneous contact sheets in evidence tempts us to term the argument disingenuous.

In response to a question form the deputy attorney general on direct, the family services specialist testified about the Division's efforts to ensure defendant was receiving the appropriate type of treatment in Florida, by stating "[t]he Division submitted Dr. Yeoman's recommendation" to defendant's service provider. The deputy did not explore the issue further and did not ask the case worker to review the case sheets documenting the Division's efforts. On cross-examination by the law guardian for Jade and Pauline, the worker again testified that she provided Dr. Yeoman's recommendations to "[t]he person . . . in charge of [defendant's] case," whom she "believe[d]" was "her actual therapist." That led to the following exchange between the two:

Q: You don't know?

A: No, I don't.

25

Q: So you're not sure if her therapist actually got Dr. Yeoman's recommendations?

A. No.

The law guardian likewise did not direct the worker's attention to the case sheets in evidence. A review of those documents makes clear, however, that not only had the case worker emailed Dr. Yeoman's last evaluation to defendant's Florida therapist on May 24, 2018, she also spoke with her on the telephone the same day and "advised [the therapist] of what [defendant] needs to be working on according to Dr. Yeoman's report." As that occurred exactly two weeks after defendant began her outpatient therapy in Florida, we dismiss defendant's argument that the Division's "blatant failure to do anything with Dr. Yeoman's treatment plan" requires reversal of this guardianship judgment. Defendant's argument that the Division failed to make reasonable efforts to reunify her with her children is simply belied by the overwhelming evidence to the contrary in the record.

Defendant's argument that the judgment must be reversed because of the Division's failure to timely assess her great aunt for placement of the children is similarly constructed on isolated facts that obscure the larger picture. The Division concedes that it failed, through an oversight, to assess defendant's great aunt Edith. It also notes, however, that defendant did not raise the issue

26

at either guardianship trial, asserting the argument only in her brief on appeal. Notwithstanding, following the filing of defendant's merits brief, the Division attempted to assess Edith, submitting an interstate request to Florida. Edith failed to respond and was eventually sent a rule out letter from which she did not appeal.

The Law Guardian for Jade and Pauline moved to supplement the appellate record with documents relating to the rule out. Defendant cross-moved to remand the issue for an evidentiary hearing to assess the basis of the Division's rule out letter, attaching a certification from Edith that she never received either a telephone call or letter from the agency supposedly conducting her interstate assessment. We granted the motion for remand, our second,[5] and a different judge concluded upon hearing testimony that Edith's

---

[5] We previously granted the Division's motion for remand to allow it to send notices under the Indian Child Welfare Act. Although defendant had never asserted Indian ancestry to the Division, she identified herself as Native American in a service referral document in 2018. When the Division belatedly discovered that fact, it sought a temporary remand to permit it to comply with the Act. After gathering information, the Division sent notice to the tribes, receiving a timely reply from the Eastern Band of Cherokee Indians that the children do not qualify as "Indian Children" pursuant to 25 U.S.C. § 1903(4). None of the other tribes responded. An order was thereafter entered by the same judge who presided over the second remand that the Indian Child Welfare Act does not apply to the children. Defendant confirmed at oral

assertion of not having received letters and calls from the interstate provider seeking to assess her for placement was not credible. The judge further found that the Division properly assessed and ruled out Edith as a placement resource for the children.

Defendant does not contend the evidence was insufficient for the remand judge to have made that finding. Instead, she asserts we should admonish the Division for its failure to timely assess Edith and continues to claim its failure somehow renders the trial court's conclusion on the third prong unreliable. While we do not condone the Division's failure to have timely assessed Edith, the Division conceded its error and took steps to rectify it. We thus find nothing to criticize. Defendant's argument that the trial court's finding on the third prong is undermined by the Division's failure to timely rule out a relative, whom she concedes — by not arguing otherwise — could not care for the children; a dereliction she never raised to the trial judge in any event, is obviously insufficient to overturn the judgment.

This case, in our view, turned on the fourth prong — whether terminating defendant's parental rights without adoptive homes on the horizon

_____

argument that she is not contesting that ruling and has accordingly abandoned the issue.

for five of the six children would not do them more harm than good.  Our Supreme Court long ago acknowledged the "unfortunate truth that not all children, who are 'freed' from their legal relationship with their parents, find the stable and permanent situation that is desired even though this is the implicit promise made by the state when it seeks to terminate the parent-child relationship," N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 611 (1986) (quoting In re Angelia P., 623 P.2d 198, 210 (Cal. 1981) (Bird, C.J., concurring and dissenting)).  With that understanding, we have admonished that "[a] court should hesitate to terminate parental rights in the absence of a permanent plan that will satisfy the child's needs."  N.J. Div. of Youth & Family Servs. v. B.G.S., 291 N.J. Super. 582, 593 (App. Div. 1996).

Although the trial judge did not separately analyze the fourth prong as to each child as he should have, we have no doubt he was clear-eyed about what he was balancing in assessing that "fail-safe" prong — whether more harm is likely to befall these children by staying with their mother than by being permanently separated from her.  See A.W., 103 N.J. at 610.  And on that critical question, while the children's prospects for achieving permanency through adoption differed, those prospects were all balanced against one

29                                                  A-3569-18T3

constant — the unrebutted expert testimony that none of the children was bonded to defendant.

None of the parties to this appeal requested oral argument. Because the deputy attorney general, however, had sent us several letters during the pendency of this appeal advising of changes in one child or another's placement status pursuant to Rule 2:6-11(f), and we thought it important to have a better understanding of where matters stood, we requested the parties orally argue the appeal and asked the deputy to provide us current information on the placement status of each child. In response, the deputy advised that Daniel was "stepped down" from the Youth Consultation Service - Holly Center to a Devereux Treatment Home two months ago; Martin remains in the adoptive home of his paternal grandmother, where he has been for the five years since removal; Kevin moved to an adoptive home ten months ago; and Ilene, Jade and Pauline are together in an adoptive home where they were placed over a year ago.

As in N.J. Div. of Youth & Family Servs. v. T.S., 417 N.J. Super. 228, 247 (App. Div. 2010), our review of the trial court's decision in this case has thus been "aided by the benefit of time." But unlike in that matter, where a culmination of events post-judgment caused us to question an otherwise sound

decision by the trial court terminating a parent's rights, id. at 249, here post-judgment developments largely have tended to vindicate the trial judge's acceptance of the Division's testimony "that the children were still adoptable and capable of a permanent placement," A.W., 103 N.J. at 616, and thus that termination of defendant's rights as her children would not do them more harm than good. Now, unlike at the end of trial when five of these six children had only the prospect of select home adoption, five of the six are in pre-adoptive homes with the stable and permanent relationship with a nurturing adult such homes promise.

While the law guardians for Ilene, Jade and Pauline urge us to affirm the decision terminating defendant's parental rights, thus freeing them for adoption, the law guardian for Daniel, Martin and Kevin echoes the arguments by defendant we have rejected, and adds that the trial court erred in finding termination was in the boys' best interests "where they firmly desire to return home, [Daniel's] and [Kevin's] prospects for adoption are exceedingly slim, and there is no compensating benefit to severing the parental relationship."

While conceding that Martin has been in a pre-adoptive home since removal and Kevin's prospects for adoption have changed for the better, given he has been in a pre-adoptive home for over ten months, their law guardian

argues the court failed to take their and their brother Daniel's wishes to maintain a relationship with their mother and each other into account, and that the Division never considered placing fewer than all six children with defendant. They stress that defendant "has no issues with substance abuse or criminal activity and only minor concerns about her mental health."

We agree with Daniel, Martin and Kevin that the trial judge erred in failing to address the children's wishes in his opinion, see E.P., 196 N.J. at 113, and to consider the children individually.[6] We also agree that in

---

[6] It is not correct that the Division did not advocate for addressing the children individually or consider placing fewer than all six with defendant. While pressing for termination of defendant's rights to all six children at the first guardianship trial, the Division sought, alternatively, to terminate defendant's rights to Martin, Jade and Pauline, all of whom were in pre-adoptive homes at the time of the first guardianship trial, consistent with Dr. Yeoman's opinion. The trial judge rejected that position, stating:

> [t]he court cannot merely look at the roster of children and determine that since [Martin, Pauline and Jade] have adoption possibilities and [Daniel, Ilene and Kevin] do not that it would be appropriate to terminate [defendant's] right to [Martin, Pauline and Jade] but let her work for a few months regarding [Daniel, Ilene and Kevin]. That approach is untethered to the statute and is without standard.

As already noted, the Division did not appeal that decision, and as it is not before us, we express no opinion on it. To the extent it could suggest that a court is not to treat each child individually as to all four prongs of the best

comparison to the circumstances of many other parents facing termination of their rights to their children, defendant's problems appear as obstacles she could more readily overcome. But that only makes more tragic that defendant has not rectified problems that have persisted for almost ten years now, and resulted in the children having been removed from her care five years ago. Notwithstanding the efforts of two state child welfare agencies, defendant has never managed to provide a safe or stable home for any of these children or correct the problems that led to their removal. Indeed, throughout all these years, there has been only one period of nearly a year in which defendant was compliant with services or making any real effort at reunification with these six children, which coincided with the birth of her seventh child.

Moreover, she never appeared to grasp the harm she had done and continues to do to them. There are entries in the case sheets, referred to at trial, of visits in late 2018 and early 2019 between defendant and the children supervised by the case worker, in which the worker relates defendant's

_____

interests standard, as opposed to a finding that the Division had not clearly and convincingly established that defendant was unable or unwilling to eliminate the harm, we do not endorse it. See A.W., 103 N.J. at 613-14 (discussing circumstances of each child vis a vis the parents and the child's potential for establishing a permanent relationship with another nurturing adult).

A-3569-18T3

passivity in the face of aggressive play and roughhousing among the children. In one, the worker related that she several times had to redirect the children to keep them from hurting one another. Each time the worker spoke to the children, defendant would interject to inform that worker that was how her children played, and that they "get their behaviors from her family." On another occasion, shortly before the second trial, when the worker was again having to stop the children from too-aggressive play while defendant sat passively watching, defendant told the worker "that's how my kids play, if they didn't play like this then I would be concerned." Dr. Yeoman noted these visits at trial, testifying that defendant didn't appreciate the problem of letting this chaotic behavior go unchecked.

The conclusion is inescapable that defendant remains oblivious to the serious behavioral problems exhibited by each of these children, which vary only in the degree of severity each demonstrates. The record is stuffed with reports of their aggressive and inappropriate behavior toward other children and resource parents, and it is one of the main reasons, as counsel has acknowledged, for the difficulties the Division has experienced in finding permanent homes for them. Dr. Yeoman opined years ago that defendant's "lenient parenting style" failed these children by not ensuring they could

34

"develop internal controls and an understanding of the importance of following rules," and that the amount of structure and guidance she could provide them "would be inadequate for healthy development."

Even more troubling is Dr. Yeoman's observation during the bonding evaluation that defendant did not actively demonstrate any affection for her children or enthusiasm for interacting with them. Having reviewed this voluminous record in some detail, that fact remains the most fundamental and striking here. Defendant has simply rarely, if ever, demonstrated love, care or consideration for any of these children, nor any delight or enthusiasm in interacting with them. Her failure to communicate such feelings to them, for we assume she has them, explains the absence of a bond between defendant and any of these six children and readily distinguishes this case from E.P., which the Court characterized as one in which "a parent-child relationship that continued to provide emotional sustenance to the child" was "severed based on the unlikely promise of a permanent adoptive home." 196 N.J. at 114.

There is nothing in this record demonstrating that any of these children is sustained emotionally by their relationship with defendant. As the Supreme Court has explained, "given the need for continuity, the child's sense of time, and the limits of our ability to make long-term predictions, [the best interests of the

A-3569-18T3

child] are more realistically expressed as the least harmful or least detrimental alternative." A.W., 103 N.J. at 616 (quoting Albert J. Solnit, Psychological Dimensions in Child Placement Conflicts, 12 N.Y.U. Rev. L. & Soc. Change 495, 499 (1983-84)). Having reviewed the evidence and considered the Division's success in securing pre-adoptive homes for Ilene, Kevin, Jade and Pauline after entry of the judgment, we are satisfied that termination of defendant's parental rights is the least harmful or detrimental alternative for them and Martin. Accordingly, because there is sufficient support in the record for the trial court's conclusion that the Division proved the first three prongs of the best interests standard by clear and convincing evidence as to all six children, and likewise proved the fourth prong as to the five younger children, we affirm the termination of defendant's parental rights as to Martin, Ilene, Kevin, Jade and Pauline,.

Notwithstanding our general confidence in the trial court's findings, Daniel's more significant problems, his uncertain future, his desire to retain his connection to his mother, and the trial court's failure to address specifically whether termination of defendant's parental rights might leave Daniel worse off, notwithstanding the unrebutted testimony that he lacks a healthy psychological bond with his mother, compels us to vacate the judgment as to him and direct a

36

limited remand for the court to address the fourth prong of the best interests test in light of his, and defendant's, current circumstances.

Affirmed in part, vacated in part, and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3569-18T3