# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4062-18T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

    Plaintiff-Respondent,

v.

D.M.H.,

    Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF D.M.G.,
a minor.

_____

Argued December 9, 2020 – Decided February 1, 2021

Before Judges Ostrer, Accurso and Enright.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Mercer County, Docket No. FG-11-0057-15.

T. Gary Mitchell, Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public

Defender, attorney; T. Gary Mitchell, of counsel and on the briefs).

Salima E. Burke, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Salima E. Burke, on the brief).

David Valentin, Assistant Deputy Public Defender, argued the cause for minor D.M.G. (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; David Valentin, on the brief).

PER CURIAM

Defendant D.M.H. (Dana[1]) appeals from the Family Part's May 2, 2019 judgment terminating her parental rights to her daughter D.M.G. (Daisy), born November 27, 2010. Dana challenges the court's findings on all four prongs of the best interests standard. N.J.S.A. 30:4C-15.1(a). The Law Guardian for the child joins the Division of Child Protection and Permanency (Division) in opposing the appeal. Having reviewed the record in light of Dana's arguments, we conclude that the trial court correctly applied the governing legal principles, and sufficient credible evidence supports its finding that the Division satisfied the best interests standard. Therefore, we affirm.

---

[1] In accord with Rule 1:38-3 and the for the reader's convenience, we use initials and pseudonyms for the parties.

I.

This case followed an atypical path: Dana entered an identified surrender of her parental rights; when the identified resource parent's adoption fell through years later, Dana decided to assert her parental rights while the Division sought termination.

Daisy's initial placement occurred in March 2013 after Dana reported she was homeless and jobless; Dana suffered from behavioral health disorders; and Daisy was exposed to domestic violence between Dana and Dana's then boyfriend. In the two-and-a-half years that followed, Dana still lacked stable housing and employment; she was incarcerated for several months; and, resisted offered services to address her untreated mental illness. She also rarely visited her daughter; she saw her just five times in the year before the surrender.

In early 2014, while in the care of her third non-relative placement, Daisy was diagnosed with post-traumatic stress disorder and attention-deficit disorder and exhibited other problematic behaviors.

In August 2015, faced with an approaching guardianship trial, Dana surrendered her parental rights provided that Daisy's then-resource parent, M.M. (Marcy), adopt her. Daisy had been living with Marcy since April. It was Daisy's fifth placement. When Dana surrendered her rights, she acknowledged

to the court that she suffered from mental illness that she needed to address; Marcy was a loving foster parent; and Marcy's adoption of Daisy would serve Daisy's best interests. The following year, the court terminated Daisy's father's parental rights after a trial, and we affirmed the trial court's judgment, N.J. Div. of Child Prot. & Permanency v. J.E.G., No. A-2968-15 (App. Div. Dec. 9, 2016), freeing Daisy for adoption.[2]

But, Daisy's adoption by Marcy was not to be. In the summer of 2016, a boy sexually assaulted Daisy while the two were in daycare. The boy, who had also been placed in Marcy's home, was removed and Daisy remained and received counseling. Notwithstanding that incident, Daisy evidently was strongly bonded to Marcy, and identified her as her mom. She had progressed behaviorally and was mainstreamed at school. However, in November 2017, Daisy was removed from Marcy's home because Marcy allegedly endangered the welfare of another child in her care. Following Daisy's removal from Marcy's home, and then an unsuccessful placement in another home, Daisy experienced a months-long behavioral health crisis that included placement in

---

[2] In contrast to her position in Daisy's case, Dana contested termination of her parental rights to a son, born April 10, 2015, which was granted after a trial in June 2017. N.J. Div. of Child Prot. & Permanency v. D.M.H., No. FG-11-0009-17 (Ch. Div. June 30, 2017). Dana evidently did not appeal that judgment.

multiple therapeutic treatment homes. Marcy was eliminated as a potential adoptive parent.

In March 2018, the Division notified Dana, then living in Colorado, that her parental rights were reinstated, because of the failed placement with Marcy.[3] At that point, Dana said she wanted to visit Daisy, with the goal of regaining custody of the daughter she had not seen in over two-and-a-half years. The Division opposed reunification and proposed a plan to terminate her parental rights. The Division contended that Dana had not, in the intervening period, successfully addressed her mental illness or instability, and she remained unable to successfully parent Daisy, especially given Daisy's special needs.

Back in 2016, an evaluation in Colorado concluded that Dana needed long-term psychiatric treatment, but her compliance with treatment was episodic. In the months leading up to the guardianship trial in early 2019, Dana was unable to visit her daughter. Daisy's therapist believed that it would interfere with her recovery. Although the court permitted defendant to conduct an expert evaluation on that point, none was performed. Also, in January 2019, a Colorado assessment under the Interstate Compact for Placement of Children

---

[3] If the identified person cannot adopt the child, the "identified surrender" becomes "void" and the surrendering parent's rights are "reinstated." N.J. Div. of Youth & Fam. Servs. v. D.M.B., 375 N.J. Super. 141, 145 (App. Div. 2005).

(ICPC) found that Dana was not a suitable placement for Daisy because of a pending criminal prosecution. She was charged with felony menacing with a real or simulated weapon, assault, and harassment. By the time of trial, Dana was living in a one-bedroom subsidized apartment, obtained through a program for the disabled, which did not permit children.

The Division presented its case through the testimony of two psychological experts, Meryl Udell, Psy.D., who evaluated Dana and Daisy in mid- and late-2018, and David Brandwein, Psy.D., who evaluated Daisy in April 2017; Steve Cohen, a licensed social worker, and Daisy's therapist at the children's psychiatric community home where Daisy had been residing since July 2018; the Division adoption worker assigned to the case; and her supervisor, who addressed prospects for adoption. The Law Guardian presented no witnesses. Dana testified on her own behalf but presented no other witnesses.

We shall not review the trial testimony in depth. Suffice it to say that the two psychologists and the therapist agreed that Daisy was psychologically fragile and suffered from multiple broken attachments. She had special needs and required parenting attentive to those needs. Cohen testified that if Daisy continued to progress, her next steps would be to transfer in a few months to a non-adoptive treatment home that offered therapeutic services, and then, after

four to six months, to an adoptive home. He recommended against contact between Dana and Daisy, agreeing that introducing Daisy to a relationship that "may not be secure" would be harmful.

Dr. Udell opined that Dana did not appreciate Daisy's needs and was unable to meet them due to her own housing and employment instability, and her persistent psychological issues that she had not addressed adequately. Dr. Udell's diagnosis included bipolar disorder, attention deficit disorder, and an unspecified personality disorder. However, she noted that when Dana sought treatment in Colorado, she described more extensive symptoms, including those related to post-traumatic stress disorder.

Dr. Udell stated that Daisy would suffer harm if removed from her program and reunited with her mother, especially in Colorado. Dr. Brandwein also expressed concern about relocating Daisy to Colorado, based on what he knew of her before the traumatic removal from Marcy's home. He also stated that Daisy's success in therapy would be negatively affected if a caregiver minimized her needs.

Dr. Udell did not perform a bonding evaluation, because Daisy's therapist believed contact with Dana would be harmful, and Daisy did not indicate "that she knew who her mother was or that she missed her." Dr. Udell supported the

plan of select-home adoption, opining that termination would not cause Daisy more harm than good.

Dana expressed confidence that she could address Daisy's needs if gradually reunited with her. Based on the similarity of their diagnoses, Dana said she would understand what Daisy was experiencing. She said she would secure the mental health treatment and therapy Daisy needed. Notably, she articulated a greater understanding of Daisy's needs than she expressed in her evaluation with Dr. Udell. She testified that she had achieved housing stability and would be able to secure a larger apartment if she regained custody of Daisy. Her income consisted of Social Security payments of $771 a month, but she said she recently landed a job. However, she had not yet started, and she provided no documentary proof of the employment. She said she was engaged in treatment for her own mental illness. She added that the criminal charges that had been pending against her were dismissed, although she did not present an order of dismissal.

The court credited the Division's witnesses, but found Dana was not credible, because she answered questions erratically and some of her answers were uncorroborated by other evidence.

A-4062-18T2

After reviewing in detail the documentary evidence and testimony, the court found that the Division established, by clear and convincing evidence, each of the four prongs of the best interests of the child test, set forth in N.J.S.A. 30:4C-15.1(a):

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his [or her] resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.

The court found prong one was met by proof that Dana had denied Daisy nurturing and caring for an extended period of time, with the court noting the infrequency of Dana's visitation. The court also found that the parental relationship endangered and would continue to endanger Daisy's safety, health

9

or development because of Dana's "failure to maintain appropriate and stable housing, and resolve her mental health and substance abuse issues." The reference to substance abuse was based on Dana's frequent marijuana use.

With respect to count two, the court found that Dana was unable or unwilling to eliminate the harm Daisy faced, or to provide her a safe and stable home. The court noted that in the six years since Daisy's initial placement, Dana remained non-compliant with treatment, was unable to maintain stable housing, and barely attended visitation when given the opportunity. Delaying permanency would cause Daisy additional harm.

The court was also firmly convinced that the Division made reasonable efforts required by prong three to provide Dana services to remediate the circumstances that led to Daisy's placement outside the home. The court noted the Division's efforts to provide supervised visitation, numerous substance abuse and psychological evaluations, parenting classes, and transportation assistance. Dana declined a Division worker's offer to help secure removal of a welfare program sanction. The court also noted the Division's efforts to explore placements with relatives, who were ruled out because they were unqualified, or unwilling to participate. After the adoption fell through, the Division twice sought ICPC studies in Colorado. Both times, approval of placement was not

secured, first because Dana was homeless; and then because she faced criminal charges.

Finally, the court found that termination would not do more harm than good. Based on Dana's unaddressed mental health and substance abuse issues, and her "instability and inconsistency," the court concluded there was "no realistic likelihood" that Dana could "safely and appropriately care for her child now or in the foreseeable future." Daisy did not view Dana as her mother. Daisy had not seen Dana in four years. The court endorsed Dr. Udell's view that Daisy would suffer harm if she left her current residential program and reengaged with Dana. But, Daisy would suffer no significant harm if her relationship with Dana were terminated. The court also credited a Division witness's testimony that an adoptive home would become available when Daisy completed treatment.

A year after the court's judgment, the Division notified the court, under R. 2:6-11(f), that Daisy had been in the same treatment home since May 2019. Contrary to Cohen's testimony that a treatment home would be non-adoptive, the Division stated that "more recently, her treatment home parent has indicated a desire to adopt her." At oral argument, the Law Guardian asserted that Daisy eagerly wished adoption.

A-4062-18T2

In her appeal, Dana challenges the court's finding on each of the four prongs of the best interests test.

## II.

We exercise limited review of the trial court's decision. In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002). We defer to the trial court's fact-finding because of its "special expertise" in family matters and its "superior ability to gauge the credibility of the witnesses who testify before it." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012). Absent legal error, which we review de novo, Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366 (1995), our role is to examine the record and determine if it contains "substantial and credible evidence to support the family court's decision," F.M., 211 N.J. at 448. Put another way, we may disturb the trial court's findings only if "they are so wide of the mark that our intervention is necessary to correct an injustice." Id. at 448 (internal quotation marks and citations omitted). If there is adequate support for the court's judgment, we may not "second-guess" it, even if we would have reached a different conclusion. Id. at 448-49.

At the outset, defendant argues that the trial court's findings are not entitled to the usual deference because the court relied on a voluminous

A-4062-18T2

documentary record, and on witnesses who also relied on records of incidents about which they had no personal knowledge. We are unpersuaded. This is not the "rare occasion[]" when we may withhold deference to the trial court because "no hearing t[ook] place, [and] no evidence [was] admitted." N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 396 (2009).

Contrary to defendant's argument, this case did "turn upon contested issues of witness credibility." N.J. Div. of Child Prot. & Permanency v. N.B., 452 N.J. Super. 513, 521 (App. Div. 2017). For one, Dana testified at length about what she would do in the future, if given the opportunity to reunite with her daughter, including adhering to her own mental health treatment, assuring that Daisy received treatment, and maintaining housing stability. Statements about future behavior raise a quintessential credibility question. We are obliged to defer to the trial judge's determination that Dana was not credible.

We also reject defendant's argument that the court did not apply the "clear and convincing" standard of proof, N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 612 (1986), and did not resolve "all doubts . . . against termination of parental rights," N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 102-03 (2008); A.W., 103 N.J. at 608. The court correctly articulated the standard,

and applied it to the facts in this case, notwithstanding Dana's disagreement with the result.

We turn next to defendant's challenge to the trial court's best interests analysis. We find no legal support for defendant's argument that "the evidence relevant under prong one should have been limited to the time after parental rights were reinstated for [Dana] in May 2018," and that "what occurs before a surrender cannot be deemed harm." To the contrary, the Court in E.P., 196 N.J. at 104-05, considered events before and after a parent's failed identified surrender in finding the Division satisfied the first two prongs. A parent's "past conduct can be relevant . . . in determining risk of harm to the child," N.J. Div. of Youth & Fam. Servs. v. I.H.C., 415 N.J. Super. 551, 573 (App. Div. 2010), and the trial court did not err in considering it here. Furthermore, the court did not rely on Dana's unselfish surrender of her rights in 2015 as proof of harm; the court relied on the facts that preceded it.

The record amply supports the court's finding that Dana endangered Daisy's health or development by "withdraw[ing] . . . that solicitude, nurture, and care for an extended period of time [which] is in itself a harm" under prong one, see In re Guardianship of D.M.H., 161 N.J. 365, 379 (1999), and by failing to adequately address her own mental illness, see F.M., 211 N.J. at 450-51

(stating that untreated mental illness that threatens harm to a child may disqualify a parent from raising the child). After Daisy's placement in 2013, Dana's visits with her daughter were few and far between. We recognize that the two-and-a-half-year-long pre-surrender period included several months when Dana was incarcerated. We also recognize that for a brief period, the trial court had suspended visitation to coerce Dana to submit to a required psychological evaluation that she repeatedly avoided. Nonetheless, the parental relationship was harmed by Dana's absence from her daughter's life.

The court also credited Dr. Udell's testimony that Dana had not obtained the level of treatment needed to address her mental health issues. The record demonstrated that, when her mental illness was untreated or inadequately treated, she lacked the capability to consistently and appropriately fulfill parenting responsibilities. "Courts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect." D.M.H., 161 N.J. at 383.

The court also properly considered the potential harm to Daisy if she were returned to Dana. See A.W., 103 N.J. at 605 (stating "[t]he potential return of a child to a parent may be so injurious that it would bar such an alternative"). The court concluded, with sufficient support in the record, that Dana lacked the

necessary understanding of Daisy's needs. And, based on her own instability and persistent mental health issues, Dana lacked the capability to meet them into the future.

We do not minimize the significant harm that Daisy experienced while in placement, including the sexual assault and the cascade of psychological conditions that followed her removal from Marcy's home. But that harm does not mitigate or excuse Dana's harm to Daisy, which the Division established under prong one. It is inappropriate "to consider as a factor mitigating or excusing the showing of injury to the children that . . . their placement had not been successful . . . [or] there had been difficulties with the new foster parent." See A.W., 103 N.J. at 614.

Turning to prong two, there was sufficient evidence in the record to support the court's conclusion that Dana was unable or unwilling to eliminate the harm facing Daisy, or to provide a safe and stable home for her; and delay in a permanent placement would add to the harm. The court's decision did not turn on Dana's "needing government assistance," as she argued. It turned on the trial court's determination, based in part on its assessment of Dana's credibility, that Dana had not yet achieved the stability in her own life — by obtaining and keeping appropriate housing, and managing her mental illness — that was a

prerequisite to her providing what her daughter needed. Dr. Udell's opinion buttressed the court's conclusion that Dana was unable or unwilling to meet her daughter's needs. Prong two requires a judge to peer into the future and "'determine whether it is reasonably foreseeable that the parents can cease to inflict harm upon the child[] entrusted to their care.'" A.W., 103 N.J. at 607. In Dana's case, the court concluded it was not. There was sufficient credible evidence in the record to support the court's conclusion.

Dana also contends the court placed undue weight on her legal use of marijuana in Colorado. The issue is not the legality of marijuana use. It is whether Dana's conceded daily use of marijuana would affect her ability to attend to her responsibilities as a parent. We recognize that the Division bears the burden to demonstrate that drug use poses a risk of harm. N.J. Div. of Youth & Fam. Servs. v. V.T., 423 N.J. Super. 320, 331-32 (App. Div. 2011). However, Dana never complied with the court's order to submit to a substance abuse evaluation and comply with its recommendations. In any event, there was sufficient support of the court's prong two finding, without reference to Dana's marijuana use.

Regarding prong three, the court appropriately relied on the services offered before Dana's identified surrender, for the same reasons it was

appropriate to rely on the harm that preceded the surrender. The court's conclusion that those services met prong three was supported by sufficient credible evidence.

We reject Dana's argument that the trial court's prong three finding should be set aside because the Division failed to allow visitation after the failed placement. In making reasonable efforts, the Division is required to facilitate "appropriate visitation." N.J.S.A. 30:4C-15.1(c)(4) (emphasis added). The Division may restrict visitation when it would be "psychologically harmful," N.J.A.C. 3A:15-1.15(a)(1), a decision that may be based on a "mental health therapist's recommendations," N.J.A.C. 3A:15-1.15(a)(1)(iii). The trial court reasonably relied on the advice of Daisy's therapist that visitation would be harmful, in other words, inappropriate.[4] The court granted Dana's counsel the opportunity to obtain an independent evaluation regarding visitation, to challenge reliance on the therapist's opinion, but no independent evaluation was provided to the court.

On the other hand, as the Division concedes, it failed to promptly inform Dana of the failed adoption. But, that is not "fatal," since Dana participated in

---

[4] Dana argues that the therapist was deprived of essential information about Daisy's mistreatment in prior placements, but Dana does not demonstrate how that would have changed the therapist's opinion.

the case for many months after she received formal notice her rights were reinstated. See N.J. Div. of Child Prot. & Permanency v. P.O., 456 N.J. Super. 399, 409 (App. Div. 2018) (noting that lack of notice of a failed identified surrender was "not fatal to the determination" to terminate parental rights, because the "[d]efendants' rights were restored and they were parties to a full trial on the merits"). We also recognize that, despite the efforts of the Division caseworker, Dana's lack of a full understanding of Daisy's mental health needs could be attributed to the Division's failure to convey that information. See N.J.S.A. 30:4C-15.1(c)(3) (defining "reasonable efforts" to include "informing the parent at appropriate intervals of the child's progress, development, and health"). However, the reasonableness of the Division's efforts must be viewed in their totality. See N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 286 (2007) (noting that "[a]lthough parents always can argue that [the Division] should have done more, the third prong" can be satisfied when considering "the services provided and the various efforts that were expended"). Notably, Dana testified that she received all the services she needed.

Finally, we discern no error in the court's finding that termination of Dana's rights would not do more harm than good. Dana's argument focuses on Daisy's uncertain prospects, at the time of trial, for select home adoption. Dana

19

contended that severing Daisy's ties with her mother would certainly do more harm than good if Daisy never achieved the permanency of an adoptive home and became instead a "legal orphan." Dana also highlights the harm that Daisy previously experienced in Division custody, particularly the sexual assault that another child committed against her while in day care. Contending that Dr. Udell was uninformed about Daisy's mistreatment, Dana also challenges the court's reliance on Dr. Udell's opinion that termination would not do more harm than good.

We are unpersuaded. It is for the fact-finder, in assessing an expert's testimony, to determine the impact of the expert's failure to consider relevant information. We are obliged to defer to the trial court's decision to credit Dr. Udell's opinion. She testified that Dana needed significantly more treatment than she was receiving; she lacked the capacity to meet Daisy's needs; or to mitigate the harm she would suffer by disrupting her therapy in New Jersey.

Also, the relationship between Dana and Daisy was essentially non-existent. Dana described it as "inchoate." But, evidently, it was not even that. Daisy's therapist stated that Daisy avoided any discussion of her natural mother and used "mom" to describe subsequent caretakers. Although "[a] court should hesitate to terminate parental rights" absent "a permanent plan that will satisfy

the child's needs," <u>N.J. Div. of Youth & Family Servs. v. B.G.S.</u>, 291 N.J. Super. 582, 593 (App. Div. 1996), sometimes, termination "must precede the permanency plan," <u>A.W.</u>, 103 N.J. at 611.

Particularly given the harm Daisy suffered as a result of prior failed pre-adoptive placement, Dana questioned the likelihood that the Division would ultimately succeed in finding Daisy a pre-adoptive home. However, in this case, we have been informed that the Division's goal of locating an adoptive home has been realized. That fact provides additional support for the court's conclusion that termination of Dana's rights would not cause more harm than good.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4062-18T2